# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 05-4345/06-1033
_____

Matrix Group Limited, Inc.,      *
     *
     Plaintiff - Appellee/      *
     Cross-Appellant,      *
     *
     v.      *
     *
Rawlings Sporting Goods      *
Company; K2, Inc.,      *
     *
     Defendants - Appellants/      *
     Cross-Appellees.      *      Appeals from the United States
_____      District Court for the Eastern
     District of Missouri.

Matrix Group Limited, Inc.,      *
a Florida Corporation with      *
a principal place of business      *
in Safety Harbor, County of      *
Pinellas, State of Florida,      *
     *
     Plaintiff - Appellee/      *
     Cross-Appellant,      *
     *
     v.      *
     *
Rawlings Sporting Goods      *
Company, Inc., a Delaware      *
Corporation with a principal      *
place of business in Fenton,      *
County of St. Louis, State      *
of Missouri,      *
     *

Defendant - Appellant/          *
Cross-Appellee.                 *

_____

Submitted: November 13, 2006
Filed: February 20, 2007

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

After Rawlings Sporting Goods Company terminated an agreement granting an exclusive license to Matrix Group Limited to sell its sports bags, the parties sued each other for breach of contract. Matrix also asserted claims against Rawlings and K2, Inc., Rawlings' parent corporation, under a Florida statute on deceptive trade practices and a tortious interference claim against K2. The district court[1] granted summary judgment to Matrix on the contract, and a jury returned verdicts in favor of Matrix against Rawlings and K2. Post trial motions were denied, except for Rawlings' motion to reduce Matrix's compensatory damage award. Rawlings and K2 appeal the judgment in favor of Matrix and the denial of post trial motions. Matrix appeals the reduction of its damage award and the dismissal of its claims under the Florida statute and for punitive damages. We affirm on all but one issue.

I.

Matrix, which is headquartered and incorporated in Florida, produces and sells bags for sporting equipment. Rawlings, a Delaware corporation, makes sporting equipment for use in baseball, softball, basketball and football. On July 31, 1996,

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

Rawlings and Matrix executed the contract which is the subject of this litigation. Under that contract, Matrix had an exclusive license to use Rawlings' trademarks in producing, marketing, and selling equipment bags, and the license was to continue so long as certain conditions were satisfied. Matrix agreed to use its "best efforts to foster and develop the products" and to maximize sales. It further agreed to meet certain minimum average annual sales levels over a five year period. Rawlings agreed not to produce or sell bags that competed with those of Matrix or to sell bags over a certain size. A section entitled "Breach" provided that if either party "breache[d] any of the provisions" of the contract, written notice of the breach had to be given to the breaching party. The other party was entitled to terminate the contract if the breaching party did not cure the breach within thirty days after the written notice. A separate section entitled "Immediate Termination" stated that Rawlings, upon notice to Matrix, could immediately terminate the agreement if Matrix became insolvent. The contract was to be governed by the law of Delaware.

There was testimony at trial that annual sales of Rawlings bags were about $300,000 at the time Matrix took over its sporting bag business. By 1999 sales had reached $3 million per year, but in the next several years they declined and were at about $865,000 in 2003. Nevertheless, Matrix met the contract's minimum sales requirements at all times during the contract period.

In March 2003 K2 acquired Rawlings as a subsidiary, and then in September it also acquired Worth, a competitor to Matrix in the sporting equipment bag industry. K2 made plans to consolidate parts of the sales forces of Rawlings and Worth, and Louis Orloff, the president of Matrix, wrote to Rawlings that such a consolidation would violate the noncompete clause of the agreement between Matrix and Rawlings.

For some time Rawlings had been concerned with the decline in its bag sales and believed that Matrix was uninterested in growing this business and was not using its best efforts to foster and develop its products. In a meeting with Orloff in

November 2003, Rawlings management expressed concern that the bag line was stagnant. Rawlings was dissatisfied with Orloff's response to these concerns, which it believed showed that Orloff considered Rawlings' bag line relatively unimportant and that he had no desire to innovate. During that same month K2's consolidation plans were carried out, and portions of the Rawlings and Worth sales forces were combined.

After the November 2003 meeting between Orloff and Rawlings management, Orloff sent a letter to Rawlings referring to the parties' disputes and outlining Matrix's positions on them. He reiterated his belief that consolidation of the Rawlings and Worth sales forces would violate the parties' contract. Rawlings felt that this letter did not satisfactorily respond to its concerns and its president, Robert Parish, discussed the Matrix letter with Monte Baier, K2's general counsel, and decided to terminate the license agreement.

On January 30, 2004, Matrix initiated its breach of contract action against Rawlings in the United States District Court for the District of Maine, alleging breach of the license agreement's noncompete duties. By letter dated February 2, 2004, Rawlings informed Matrix that it would terminate the contract effective thirty days from the date of the letter for Matrix's failure to use best efforts. The letter further stated that the contract notice provision, requiring a thirty day period for cure of breach, was inapplicable "because Rawlings has repeatedly requested that Matrix comply with the terms of the Agreement requiring Matrix to use its best efforts ... and Matrix has failed and refused to comply." On the same date as that letter, Rawlings filed its action against Matrix in federal district court in the Eastern District of Missouri for breach of Matrix's duty to use best efforts.

Matrix moved for a temporary restraining order and preliminary injunction against Rawlings in the Maine case while Rawlings sought to transfer that action to

the Eastern District of Missouri. The district court denied Matrix's motion[2] and transferred the Maine case to the Eastern District of Missouri where it was consolidated with the action already filed there.

The cases were realigned, and additional claims were asserted. Matrix alleged that Rawlings had wrongfully terminated the contract by failing to give it the required thirty day period in which to cure its breach. Matrix also joined K2 as a party and alleged that it and Rawlings had violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-.23. In addition Matrix asserted that K2, by acquiring Worth and consolidating the sales forces of Rawlings and Worth, had caused Rawlings to breach the license agreement's noncompete clause and tortiously interfered with that agreement in violation of Florida common law. Matrix sought compensatory and punitive damages, as well as equitable relief to prevent consolidation of the Rawlings and Worth sales forces and the selling or promoting of competing bags.

Rawlings and K2 subsequently moved for dismissal of Matrix's Florida statutory claim and for summary judgment on Matrix's contract and common law tort claims. In its motion Rawlings raised an additional theory justifying its termination of the contract on the ground that Matrix was insolvent and therefore in breach. To support this theory it produced a balance sheet from 2004 showing that Matrix's liabilities exceeded its assets. Matrix in turn moved for summary judgment both on its claim that Rawlings had wrongfully terminated the license agreement and on Rawlings' breach of contract claim.

In ruling on these motions, the district court concluded that Matrix's statutory claim should be dismissed for failure to state a claim. Summary judgment was

---

[2]The First Circuit later affirmed the denial of the temporary injunction. Matrix Group Ltd. v. Rawlings Sporting Goods Co., 378 F.3d 29 (1st Cir. 2004).

granted to Rawlings on the tortious interference claim against it, but denied to K2. The district court also granted summary judgment to Matrix for wrongful termination after concluding that Rawlings' notice had violated the contract's thirty day cure provision and that there was insufficient evidence that Matrix had been insolvent.

The parties then went to trial on Matrix's claims against Rawlings for breach of the license agreement's noncompete clause and against K2 for tortious interference. As part of its compensatory damage claim, Matrix sought lost profits which it would have gained from the license absent breach. Its expert witness, Donna Beck Smith, split her calculation of lost profits into two segments: (1) the profits Matrix would have gained from the license for the first ten years after termination, and (2) the "terminal value" of the license or its residual value after those ten years. K2 and Rawlings moved for a directed verdict on the license's terminal value, claiming such damages were too speculative to be awarded, and K2 moved for judgment as a matter of law on the tortious interference claim. The motions were denied, and the cases were submitted to the jury by special verdict with instructions that if the jury found for Matrix it was to award separate damages for the ten year period after termination and for the terminal value of the license.

The jury returned a verdict in favor of Matrix and awarded damages against Rawlings in the amounts of $4,096,312 for the ten year period and $2,053,688 for terminal value. It also returned a verdict against K2 for $2,500,000. The district court entered judgment on the jury verdicts. Rawlings and K2 filed post trial motions for judgment or in the alternative for a new trial. The district court denied the motions in large part, but it did grant Rawlings' motion in respect to the terminal value award, and the judgment was amended to eliminate that portion of Matrix's award.

All parties have appealed. Rawlings argues that the district court erred in granting summary judgment to Matrix on its wrongful termination claim. K2 asserts that the jury instructions on Matrix's tortious interference claim were faulty and that

it should have been granted judgment as a matter of law on that claim. Both Rawlings and K2 argue in the alternative that they are entitled to a new trial because the verdicts were against the weight of the evidence. On its cross appeal Matrix argues that its claim under the Florida statute should not have been dismissed, that the jury should have been allowed to consider whether to award punitive damages against K2, and that the district court erred in setting aside the jury's award of damages for the license's terminal value.

## II.

### A.

In challenging the district court's summary judgment decision, Rawlings argues that it was excused from complying with the contract's thirty day notice and cure provision because Matrix had already materially breached the contract by failing to use its best efforts. According to Rawlings, this prior breach is a complete defense to Matrix's breach of contract action because a plaintiff must demonstrate substantial compliance with all contractual provisions before receiving relief. Matrix responds that the contract must be enforced according to its own terms and that it unambiguously required notice of breach and provided a thirty day period to cure. We review a grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Hope v. Klabal, 457 F.3d 784, 790 (8th Cir. 2006). A district court's interpretation of state law is also reviewed de novo. Id.

The contract provided for Delaware law to control, and Rawlings argues that under that law a party need not give notice of termination if there is a material breach of the contract by the other party. We have found no decision of the Delaware Supreme Court on this point of law, and Rawlings cites none. Rawlings does cite dicta in one chancery case, see A.R. Dervaes Co. v. Houdaille Indus., Inc., 1982 WL 17883 at *2 (Del. Ch. Jan. 14, 1982), and also a trial court decision interpreting a

statutory notice provision, see Braxton v. Adirondack Group, Inc., 2003 WL 22938542 at *5 (Del. C.P. Aug. 11, 2003). Matrix cites a federal district court case that directly contradicts Rawlings' position, however. Harper v. Del. Valley Broad., Inc., 743 F. Supp. 1076 (D. Del. 1990), aff'd mem., 932 F.2d 959 (3d Cir. 1991). In Harper, the district court applied Delaware law to hold that one party's alleged failure to perform adequately under a consulting agreement did not excuse the other party's failure to follow a fifteen day notice and cure provision. Id. at 1084.

While the case on which Matrix relies is more apposite than those cited by Rawlings, none is conclusively determinative of Delaware law. See Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967). What should determine the outcome here is the more fundamental principle that the unambiguous language of a contract must be given its plain meaning and full effect. Westfield Ins. Group v. J.P.'s Wharf, Ltd., 859 A.2d 74, 76 (Del. 2004). As the Delaware Court of Chancery has explained, "Where contract language speaks to a particular dispute, the Court gives those privately negotiated and agreed upon terms their full and plain meaning." Cont'l Ins. Co. v. Rutledge & Co., 750 A.2d 1219, 1228 (Del. Ch. 2000).

Here, the license agreement's thirty day notice and cure provision speaks directly to this dispute. The unambiguous text of that provision applies to "any" breach (other than those addressed in the immediate termination provision). The thirty day provision does not exclude "material" breaches from its required notice and cure period. If only nonmaterial breaches required notice, the word "any" would be nullified. Rawlings was thus not excused from giving Matrix notice and the period to cure.

The principle that unambiguous text governs contractual interpretation also persuades us that an alleged breach of the contract's best efforts provision is not a defense to Matrix's breach of contract action. It is precisely when a party is *not* in substantial compliance with the contract that the notice and cure provision mandates

the giving of thirty days' notice. In similar circumstances the Eleventh Circuit has come to the same conclusion while applying the law of Pennsylvania. See Alliance Metals, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 903 (11th Cir. 2000) (it would otherwise "effectively render meaningless contractual 'notice and cure' requirements"). The district court did not err by granting summary judgment to Matrix on these defenses of Rawlings to the breach of contract action.

Rawlings raises an additional point in addressing the only contractual exception to the notice and cure provision. It argues that because it presented uncontroverted evidence that Matrix was insolvent, the license agreement's "Immediate Termination" provision gave it the right to terminate Matrix immediately upon notice. That provision states that "Rawlings shall have the immediate right to terminate this Agreement upon written notice to Matrix in the event that ... Matrix becomes or is declared insolvent." Matrix disputes Rawlings' reading of the agreement and contends that it incorrectly interprets the term "insolvent" to mean balance sheet insolvency, when in actuality the term refers to equitable insolvency. Matrix also argues that Rawlings waived its insolvency defense by failing to state in its written notice to Matrix that it was terminating the contract due to insolvency. The district court agreed with Matrix's interpretation, and we review its construction of the contract de novo. Oak River Ins. Co. v. Truitt, 390 F.3d 554, 557 (8th Cir. 2004).

Matrix argues that Rawlings cannot now rely on an insolvency defense because it failed to mention insolvency in its notice of termination. A party may justify its termination of an agreement, however, "'by proving that there was, at the time, an adequate cause, although it did not become known to him until later.'" Brywil, Inc. v. STP Corp., 1980 WL 77945 at *10 (Del. Ch. July 15, 1980), quoting Coll. Point Boat Corp. v. United States, 267 U.S. 12, 16 (1925) (Brandeis, J.); see also Barisa v. Charitable Research Found., Inc., 287 A.2d 679, 682 (Del. Super. Ct.), aff'd, 299 A.2d 430 (Del. 1972). Rawlings is entitled to argue insolvency.

Insolvency carries two distinct meanings. *Balance sheet* insolvency, the interpretation which Rawlings urges for the contract term, occurs when an entity's liabilities exceed its assets. See Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 788 (Del. Ch. 1992). Matrix argues on the other hand that what is intended by the agreement is *equitable* or *cash flow* insolvency. That type of insolvency is understood under Delaware law to mean (1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be continued in the face thereof," or (2) "an inability to meet maturing obligations as they fall due in the ordinary course of business." Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 782 (Del. Ch. 2004).

Both parties cite cases which discuss the fiduciary duties owed by corporate directors to creditors. Compare U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C., 864 A.2d 930, 947-48 (Del. Ch. 2004) (using the equitable definition), vacated on other grounds, 875 A.2d 632 (Del. 2005), with Geyer, 621 A.2d at 788 (using the balance sheet definition). To support its interpretation of insolvent, Rawlings points to cases employing the balance sheet definition decided under the Delaware Fraudulent Conveyances Act. E.g., Harrington v. Hollingsworth, 1994 WL 374313 at *3 (Del. Ch. July 6, 1994). Matrix relies on decisions which use the equitable definition and deal with the appointment of corporate receivers. E.g., NCT Group, 863 A.2d at 782.

None of these cited cases deals with the interpretation of a contract containing the term "insolvent." The cases simply show that "insolvent" is reasonably susceptible of different interpretations and is therefore an ambiguous term. See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992). Delaware law directs us to look at the meaning of insolvent in the particular context in which it appears. The question is what reasonable persons in the position of the parties would have interpreted the ambiguous term to mean. See Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del. 1996). To aid our inquiry we look to the

parties' acts and statements, the business context, any prior dealings, and relevant customs in the industry.  In re Explorer Pipeline Co., 781 A.2d 705, 714 (Del. Ch. 2001).

While this agreement called for Matrix to keep records necessary for the calculation of royalties payable under it, it did not require Matrix to furnish Rawlings with general data on its financial condition.  This omission indicates that under the contract, insolvency was intended to mean an inability to continue business in the face of mounting liabilities or the inability to pay its bills as they became due. Rawlings would learn about such occurrences without access to Matrix's balance sheets or income statements.  Since Rawlings admits that it was unaware of the Matrix balance sheet on which its insolvency argument relies until after litigation had begun, it apparently did not consider it necessary to monitor the company's balance sheets. See Artesian Water Co. v. State, 330 A.2d 441, 443 (Del. 1974) (parties' own actions "of great weight" in determining contract's meaning and lead court "to presumptively correct interpretation").  Moreover, due to costs of replacing Matrix with another licensee, it is questionable that Rawlings would have only been concerned with a temporary state of Matrix's balance sheet.  In a contract of indefinite duration like this one, Rawlings would have been more likely concerned with Matrix's long term financial health and its ability to pay its bills and grow its business.  Interpreting the contract to refer to equitable rather than balance sheet insolvency is the more reasonable and therefore preferable interpretation.  See Holland v. Nat'l Automotive Fibres, Inc., 194 A. 124, 127 (Del. Ch. 1937).  Because it is undisputed that Matrix was not equitably insolvent, we conclude that summary judgment was correctly granted to Matrix on this issue.

### B.

K2 argues on appeal that Matrix did not establish a submissible case of tortious interference with a business relationship because it failed to prove an essential element

of its claim: namely, that K2 had intentionally and unjustifiably interfered with the license agreement between Matrix and Rawlings. K2 contends that its consolidation of the Rawlings and Worth sales forces was justified by its interest in its own business and its competitive position in the sporting goods industry. Furthermore according to K2, Matrix did not show that its actions were specifically intended to interfere with the license agreement and the damages awarded against it were duplicative of those awarded for Rawlings' breach of contract. We review de novo a denial of a motion for judgment as a matter of law and draw all reasonable inferences in favor of Matrix, without making credibility assessments or weighing the evidence. Battle v. United Parcel Serv., Inc., 438 F.3d 856, 861 (8th Cir. 2006).

The elements of a claim for tortious interference with a business relationship under Florida law are (1) the existence of a business relationship, (2) the defendant's knowledge of that relationship, (3) the defendant's intentional and unjustified interference with that relationship, and (4) damage to the plaintiff as a result of the breach of the relationship. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994).[3] At trial there was testimony that K2 was aware of the contract between Rawlings and Matrix and its provisions and that president Parish of Rawlings had discussed a key letter from Matrix president Orloff with K2's general counsel. That letter had warned Rawlings that K2's plan to consolidate the Rawlings and Worth sales forces would breach the contract. Because K2 nonetheless went ahead with consolidation, the jury was entitled to infer that K2 "intended to procure a breach of the contract." Chi. Title Ins. Co. v. Alday Donaldson Title Co. of Fla., 832 So. 2d 810, 814 (Fla. Dist. Ct. App. 2002). Purposely causing a breach of contract is an "improper means" of interference, McCurdy v. Collis, 508 So. 2d 380, 383-84 (Fla. Dist. Ct. App. 1987), and using improper means to interfere with a business relationship constitutes unjustifiable interference, Ethyl Corp. v. Balter, 386 So. 2d

---

[3]The district court applied Florida law to Matrix's tortious interference claim against K2; neither party challenges that choice.

1220, 1225 (Fla. Dist. Ct. App. 1980). The jury was entitled to find from the evidence that K2 had used improper means of interference and that it had intentionally and unjustifiably interfered with the license agreement.

Also unavailing is K2's argument that the damages awarded against it were duplicative. Damages for breach of contract and tortious interference are not coextensive, and a jury may award damages under both claims. See Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc., 889 So. 2d 180, 191-92 (Fla. Dist. Ct. App. 2004). Matrix's expert witness testified that it suffered a total of $12,797,893 in damages, but the damages which the jury awarded against both Rawlings and K2 totaled only $8,650,000. The jury's aggregate award was thus well within the bounds of the evidence presented at trial, and a jury may rationally allocate damages "between the two different causes of action, one for breach of contract, and one for tort." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995).

Because a reviewing court's role under the Seventh Amendment "is to reconcile and preserve whenever possible" a jury verdict, we must start with a presumption that the damages awarded were not duplicative. Id. Moreover, the acts committed by Rawlings and those committed by K2 were different. While Rawlings breached the contract by improperly terminating Matrix without a period of cure, K2 ordered the sales forces of Worth and Rawlings to consolidate, thus causing a breach of the license agreement's noncompete clause. The jury apparently intended to apportion damages between the defendants for these separate acts. In light of these points and K2's failure to raise the issue in timely fashion, we conclude that the damages awarded against K2 should be affirmed and that the district court did not err in denying K2's motion for judgment as a matter of law. See Jackson v. City of St. Louis, 220 F.3d 894, 898 (8th Cir. 2000).

K2 also argues that the district court's instructions on tortious interference were an abuse of discretion, but K2 never made a specific objection to the instructions

before submission of the case to the jury. It stated only that "the instruction as proposed is far broader than the issues as framed by the pleadings and the evidence." This objection to the district court was too general to preserve the specific objections that K2 argues on appeal, and the instructions will be reviewed for plain error only. Dupre v. Fru-Con Eng'g Inc., 112 F.3d 329, 333 (8th Cir. 1997).

K2 claims that the court erred in instructing that one of the elements of a tortious interference claim was "existing business relationships" without specifying what those relationships were. No specification was necessary, however, since the trial focused on Matrix's relationship with Rawlings. The instructions were also faulty, K2 argues, in failing to define "interference," thus allowing the jury to understand the term more broadly than does Florida law. K2 overlooks the fact that the instructions correctly stated Florida law by excluding from "interference" any action that was justified or that did not employ improper means.[4] There was no plain error in the jury instructions.

## C.

Rawlings and K2 contend that the district court erred by denying their motion for a new trial. Rawlings asserts that the lost profits award was against the weight of the evidence because Matrix's expert testimony was unreliable, and K2 claims that the verdict against it was a miscarriage of justice. The denial of a new trial motion based on the argument that the jury verdict was against the weight of the evidence "is

---

[4]K2 also challenges an instruction relating to breach of contract which stated that if the jury found for Matrix, it had to award "such sum as ... will fairly and justly compensate plaintiff for any damages [directly resulting from] the breach or breaches of the parties' contract, mentioned in the evidence." K2 believes that the reference to "breach *or breaches*" authorized Matrix to recover under a theory that K2 directed Rawlings to terminate the contract, but the specific instruction on tortious interference included no reference to such a theory.

-14-

virtually unassailable on appeal," however.  Grogg v. Mo. Pac. R.R. Co., 841 F.2d 210, 214 (8th Cir. 1988).  Rawlings never made a challenge under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to the expert testimony whose calculations it now attacks, and neither Rawlings nor K2 has shown that the verdicts were against the weight of the evidence or that there was a miscarriage of justice.  The district court did not abuse its discretion in denying the motion for a new trial.

## III.

### A.

Matrix challenges the district court's post trial elimination of the jury award for terminal value damage.  The district court set aside those damages as speculative, but Matrix argues that terminal value is a well accepted concept under the law.  Even if its expert's projections were optimistic, Matrix argues, there was nonetheless a reasonable basis for the award.  While the jury valued the license agreement's terminal value at only about $2 million, the expert testimony set it at $8.7 million.  Rawlings responds that speculation is necessarily involved in estimating terminal value because revenue lost over an infinite period could be included.

We review a grant of judgment as a matter of law de novo, applying the same standard as the district court.  We view the evidence in the light most favorable to the nonmovant, give it the benefit of every reasonable inference, and resolve all factual disputes in its favor.  If the evidence viewed according to this standard would permit reasonable jurors to differ in the conclusions they draw, judgment as a matter of law cannot be granted.  See Smith v. Chase Group, Inc., 354 F.3d 801, 806 (8th Cir. 2004).  Delaware law disapproves of speculative damages, see Scotton v. Wright, 121 A. 180, 185 (Del. Super. Ct. 1923), but damages need only have a reasonable basis, they need not be absolutely certain.  Bomarko, Inc. v. Int'l Telecharge, Inc., 794 A.2d 1161, 1184 (Del. Ch. 1999).

Matrix called Donna Beck Smith, a certified public accountant and valuation analyst, as an expert witness to establish the amount of its economic losses. Rawlings made no Daubert challenge to her testimony. Smith gave her expert opinon about Matrix's damages after having examined its past and present financial data, as well as projections about the sporting goods industry's future performance. First, she assessed damages for the present value of revenue Matrix would have gained from the license agreement over the first ten years after termination. Next, she assessed the license's "terminal value" or market value of the license agreement after those ten years, which she described as "what somebody would be willing to pay for the right to have this contract." In her valuation Smith used what is called the "constant growth" or "Gordon growth" model, which assumes constant growth of an asset and then discounts this value to arrive at the present value of the terminal value.

Calculating the value of an asset at liquidation or disposition is a necessary part of discounted cash flow analysis, which the Delaware courts have recognized as "the preeminent valuation methodology" in the financial community. Neal v. Ala. By-Products Corp., 1990 WL 109243 at *7 (Del. Ch. Aug. 1, 1990), aff'd, 588 A.2d 255 (Del. 1991); see also Kleinwort Benson Ltd. v. Silgan Corp., 1995 WL 376911 at *7 (Del. Ch. June 15, 1995) (discounted cash flow analysis "requires the experts to set a value for [the asset] at the end of the period, which is labeled a terminal value"). The constant growth model which Smith employed has been specifically recognized as an accepted way to determine terminal value. See Prescott Group Small Cap, L.P. v. Coleman Co., 2004 WL 2059515 at *14 (Del. Ch. Sept. 8, 2004). Rawlings argues that the cases in which recovery for terminal value was allowed are distinguishable because they involved statutory stock appraisal. The agreement here, however, like shares in a corporation, was expected to generate income for an indefinite period. Rawlings gives no reason why the financial principles applied to one revenue producing asset like stock should not be applied to another like a license agreement.

Rawlings points to two cases from other jurisdictions which it says reject the concept of terminal value. The Second Circuit held in a contract case under New York law that the plaintiff could recover "the market value of an income-producing asset," instead of a discounted income stream of lost profits, Schonfeld v. Hilliard, 218 F.3d 164, 177 (2d Cir. 2000), because that accounted for "the chance to earn the speculative profits." Id. (emphasis omitted). After examining Schonfeld, the Fifth Circuit decided that lost asset damages from breach of a license agreement were "determined by considering what a hypothetical buyer would pay for the chance to earn future profits." Fluorine on Call, Ltd. v. Fluorogas Ltd., 380 F.3d 849, 860 (5th Cir. 2004) (award reversal). Because the expert had failed to do "any of the calculations that distinguish a lost asset damage model from a straightforward lost-profits one," the award was reversed. Id. at 861.

Here in contrast, Smith testified that the purpose of her terminal value calculation was to ascertain what a buyer would pay for the license agreement ten years into the future by "determin[ing] the value of an asset and not lost profits year after year after year into infinity." The constant growth model is entirely different from calculating damages based on an infinite series of periodic cash flows, for its formula is meant to estimate the cash available from a disposition of the asset. See Samuel C. Thompson, Jr., A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions, 21 J. Corp. L. 457, 489-92 (1996). We conclude for these reasons that the district court erred by eliminating the award for terminal value.

B.

Matrix claims that the district court erred by deciding that as a matter of law Matrix could not ask the jury to award punitive damages against K2 for its tortious interference. K2 replies that Florida law precludes any award of punitive damages here.

A Florida statute governing the award of punitive damages in civil actions provides that punitive damages are available "only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). Because punitive damages are "reserved for particular types of behavior which go beyond mere intentional acts," Weinstein Design Group, Inc. v. Fielder, 884 So.2d 990, 1001 (Fla. Dist. Ct. App. 2004), the level of culpability which this statute demands is higher than that which is demanded by tortious interference. "Proof of the elements of tortious interference may be established even though the evidence may not justify an award of punitive damages." Air Ambulance Prof'ls, Inc. v. Thin Air, 809 So. 2d 28, 30 (Fla. Dist. Ct. App. 2002). In order to recover punitive damages Matrix would have had to prove more than just the elements of a claim for tortious interference.

Although an award of punitive damages for tortious interference requires "an illicit scheme to put [the plaintiff] out of business," or fraud or malice, id. at 31, Matrix points to no evidence from which a reasonable jury could infer that K2 was guilty of fraud or acted out of a bare desire to harm Matrix. While there is evidence that K2 acted to harm Matrix's relationship with Rawlings, there is no evidence of fraud, malice, or desire to destroy Matrix. Cf. IBP, Inc. v. Hady Enters., Inc., 267 F. Supp. 2d 1148, 1170 (N.D. Fla. 2002) (punitive damages awarded in tortious interference case where defendant's scheme involved contamination of meat, thereby "consciously disregard[ing] the health and safety of the ... public"). The district court did not err in declining to put the issue of punitive damages before the jury.

C.

Matrix contends that the district court erred by dismissing its Florida statutory claim against Rawlings and K2 on the pleadings. The Florida Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or

commerce." Fla. Stat. § 501.204(1). Before a 2001 amendment, the statute allowed only "a consumer" to pursue an action under it. After the amendment, the statute permits "*a person* who has suffered a loss as a result of a violation" to bring an action. Id. § 501.211(2) (emphasis added). Matrix relies on that amendment to bring its action and claims that Florida courts routinely permit corporations to sue under the statute. Appellants respond that the consumer protection purpose of the statute is unchanged and that Matrix therefore lacks standing to pursue its claim. Even if Matrix did have standing, they add, its complaint asserted no violation of the statute.

Statutory text and case law foreclose the argument that Matrix lacks standing because it is a corporation. Under Florida law "persons" include "corporations." Id. § 1.01(3). Moreover, we are obliged to give effect to the 2001 amendment, for "[w]hen the Legislature makes a substantial and material change in the language of a statute, it is presumed to have intended some specific objective or alteration of law." Mangold v. Rainforest Golf Sports Ctr., 675 So. 2d 639, 642 (Fla. Dist. Ct. App. 1996). Several courts have given effect to that amendment by allowing "a broader base of complainants," including corporations, to pursue actions under the statute. Niles Audio Corp. v. OEM Sys. Co., 174 F. Supp. 2d 1315, 1320 (S.D. Fla. 2001); accord Beacon Prop. Mgmt., Inc. v. PNR, Inc., 890 So. 2d 274 (Fla. Dist. Ct. App. 2004) (on remand from Florida Supreme Court, affirming jury verdict in favor of plaintiff corporation).

Matrix cannot prevail simply because it has standing, however. See Moore v. PaineWebber, Inc., 189 F.3d 165, 169 n.3 (2d Cir. 1999) (distinguishing lack of standing from failure to state a claim on which relief may be granted). Matrix's complaint alleges that Rawlings violated the statute by intentionally breaching the contract and that K2 did so by intentionally causing Rawlings to breach the contract. These allegations are insufficient to state a claim under the statute. The Florida Supreme Court has cautioned that breaches of contract, without more, are insufficient to state a claim under the statute. See PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.

2d 773, 777 n.2 (Fla. 2003). We have found no case in which mere intentional breach of contract or interference with that contract have been found to constitute a violation of the deceptive practices statute.

The cases involving corporate plaintiffs upon which Matrix principally relies have quite different facts. In one, the defendant was alleged to have continually lied to the plaintiff about its duties under a property management agreement. Id. at 774. In another, the plaintiff alleged that the defendant intentionally infringed its trade dress. Niles Audio Corp., 174 F. Supp. 2d at 1317. And in yet another, the plaintiff alleged that the defendant had entered into a transaction with bad faith and sought to drive the plaintiff out of business entirely. Hanson Hams, Inc. v. HBH Franchise Co., 2003 WL 22768687 (S.D. Fla. Nov. 7, 2003). In those cases the corporate plaintiffs alleged significant deception or malice. Here in contrast, Matrix alleged only that the appellants wanted to get Rawlings out of the license agreement and intentionally caused a breach of that agreement. There were no allegations of bad faith negotiations or deception during the life of the contract, or allegations that could give rise to an inference that the appellants wanted to ruin Matrix totally. The district court did not err by dismissing Matrix's claim under the Florida statute.

IV.

For these reasons we reverse the order of the district court striking Matrix's damages for the license's terminal value but affirm the judgment in all other respects. We grant the motion by Matrix to supplement the record on appeal and remand for entry of judgment consistent with this opinion.

_____