# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2181

_____

United States Commodity Futures Trading Commission

*Plaintiff - Appellee*

v.

Michael Burdic Kratville

*Defendant - Appellant*

Michael J. Welke; Fred Honea; John Rizzli; Ron Bassett; FXIG; Sonador; Neal LaBelle; Michael Stewart

*Defendant*s

v.

Jonathan W. Arrington; Elite Management Holdings Corp.; MJM Enterprises LLC

*Defendant*s

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 13, 2015
Filed: August 3, 2015

_____

Before WOLLMAN, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

The United States Commodity Futures Trading Commission (CFTC) brought suit against Jonathan Arrington, Michael B. Kratville, Michael J. Welke, Elite Management Holdings Corp. (EMHC), and MJM Enterprises LLC (MJM) (collectively, "defendants'). The CFTC alleged that the defendants fraudulently induced more than 130 individuals to invest $4.7 million in commodity pools operated by the defendants, in violation of the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1 *et seq*., and its implementing regulations, 17 C.F.R. §§ 1.1 *et seq*. The district court[1] granted summary judgment in favor of the CFTC against Kratville.[2] On appeal, Kratville argues that the district court erred in (1) denying his request for more time to review purportedly new evidence; (2) considering affidavits from investors who signed releases, affidavits from investors who lacked credibility, and emails that could have been altered; (3) declining to consider the affidavit of an expert opining on the authenticity of the emails; (4) granting summary judgment on the CFTC's claim that Kratville committed fraud and related violations of the CEA and CFTC regulations in soliciting persons to invest and maintain funds in commodity investment pools; and (5) determining that the litigation strategy of Kratville's attorney was not excusable neglect warranting relief under Federal Rule of Civil Procedure 60(b)(1). We affirm.

## I. *Background*

In the summer of 2005, Arrington, Kratville, and Welke formed EMHC to pursue investment opportunities. They all agreed to invest with FX Investment Group

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

[2]The court issued default judgments against Arrington, EMHC, and MJM and approved a consent order for Welke.

(FXIG), a trading group run by Fred Honea in Spain. FXIG traded in the spot (cash) and future markets for commodities, precious metals, and foreign exchange ("forex"). It operated as an investment pool so that every account's return would be the same. It reported monthly trading returns ranging from 8.6 percent to 34.6 percent per month from May 2002 through May 2005. FXIG promised investors high returns with limited risks because no more than ten percent of an individual's funds would be invested at any one time. At no time did Arrington, Kratville, or Welke ever see any FXIG trading statements to confirm FXIG's representations because Honea refused to provide them.

EMHC became the parent company or "commodity pool operator"[3] for two "commodity pools"[4] called Elite Index Investment Group (EIIG) and Elite Aggressive Growth Group (EAGG), which had been incorporated the year prior and run by Arrington. Kratville had invested in EIIG from early 2004 to mid-2005 and lost money.[5] EMHC also became the parent company for a third pool that Arrington, Kratville, and Welke opened in January 2006 called Elite Management Investment

[3]A "commodity pool operator" includes anyone who is "engaged in a business that is of the nature of a commodity pool . . . , and who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11)(A)(i).

[4]A "commodity pool" is "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A).

[5]In approximately 2004, Kratville and Welke were members of EIIG, which was run by Arrington and Neil Labelle. Kratville made a $25,000 investment to join EIIG, which was incorporated in February 2004, and began trading as early as September 2003. Elite Capital Management Group, LLC operated EIIG and EAGG. During the summer of 2005, Labelle assigned EIIG and EAGG to Arrington. At that time, some or all members received their funds back. In May 2005, Kratville received slightly less of his money back than he had invested because his EIIG investment resulted in a loss. Neither EAGG nor EIIG showed consistent profitability.

Fund (EMIF).[6] The Elite Pools had a target return structure that capped the returns to which an individual pool participant was entitled in a given month. Arrington, Kratville, and Welke were to keep all returns above the monthly caps, and they were to bear all business expenses. The returns were to be made by investing in FXIG.

Arrington, Kratville, and Welke all owned EMHC and were officers of EMHC, with Kratville holding the position of secretary. Arrington, Welke, and Kratville did not register EMHC with the CFTC as a commodity pool operator or register individually as associated persons of a commodity pool operator. *See* 7 U.S.C. §§ 6m(1) and 6k(2) (2006). EMHC never registered or filed an exemption of registration with the CFTC. *See* 17 C.F.R. § 4.13.

In addition to being an owner and officer of EMHC, Kratville had several other roles. First, when a prospective pool participant expressed interest in investing, Kratville referred that person to Arrington. Arrington, Kratville, and Welke shared potential investment contacts with the Elite Pools. Second, Kratville was originally a signatory on at least two bank accounts for EMHC, although Arrington later removed Kratville as a signor for the accounts on December 27, 2006. Third, Kratville acted as the attorney for EMHC and the Elite Pools and appeared before the Nebraska Department of Banking and Finance (NDBF) in that capacity. Fourth, Kratville reviewed and contributed to the Elite Pools website, brochure, prospectus, and monthly newsletter called "eWires."

In August 2005, Kratville began providing information about the Elite Pools to prospective pool participants. That month, Kratville emailed at least two prospective pool participants and told them that he had "formed an investment company so that we can pay people 4–6% PER MONTH because of the ability of our trader to generate consistent profits of at least 6% every month since [M]ay 2002."

---

[6]EIIG, EAGG, and EMIF will be referred to collectively as "the Elite Pools."

Kratville represented that he had "been a part of this fund since 2002" and "expect[ed] [it] to hit the 6% mark again by the end of [August 2005] . . . . for the 40th month in a row." (Ellipsis in original.) Neither Kratville's email nor the EMHC website referenced FXIG. In reality, FXIG—not the Elite Pools—reported the returns.

Kratville followed up with one of his clients, Ed Voges, several months after making representations to prospective investors. In one email to Voges, Kratville stated, "We have hit at least 6% every month since 5/02 . . . . and we don['t] get paid unless we hit your goal level first, and we charge no fees." (Ellipsis in original.) In another email to Voges, Kratville stated, "We are an investment club that is exempt from the SEC rules . . . so no filings." (Ellipsis in original.) And Kratville wrote in another email that "our main clients are people in our age group with IRAs and 401(k)s that can be rolled over into our fund and where people are looking to let it grow for a minimum of 3 years. We accept cash, of course, but we feel we do the most good for people that roll[] over tax-deferred vehicles."

Kratville also referred prospective pool participants to additional information on the EMHC website, brochure, and other marketing materials. The website made the following representation about its trading strategy, stating, in relevant part:

> Our Executive Trader and trading group designed our Special Growth Strategy over a 10+ year period of testing and trading. The principal investment markets that this strategy utilizes are equities, commodities, precious metals and currencies.

> This strategy has had many multi-million offers to buy the system, but the desire has been, and still is to help the small guy build a nest egg and to remain entirely proprietary.

> Special Growth Strategy has been designed to satisfy the demands for a product such as this from various private investors and groups. It is based on sound investment and money management principals; and uses

-5-

sophisticated procedures developed to prevent losses. No more than 10% of principal is invested at one time, yet the results are unparalleled.

In reality, neither EMHC nor any of the Elite Pools had a proprietary trading system, and the defendants never received any offers to purchase such a system.

The monthly newsletter, eWires, that Kratville forwarded to potential pool participants included representations about trading returns and stated that EMHC hit the maximum target goal for several months in a row. The eWires newsletters did not mention FXIG.

The brochure and prospectus also made several representations about EMHC's trading strategy, such as that (1) the pool's special growth strategy was designed over a 12-year period of testing and trading; (2) the strategy had attracted multi-million dollar offers to buy the system; (3) even though there was no guarantee monthly target goals could be met, such goals had been met every month since 2002; and (4) a successful local attorney—Kratville—was an active, longterm investor in EMHC.

The prospectus listed EMHC's primary broker as TradeStation Securities in Florida and its clearing house broker as R.J. O'Brien in Chicago, Illinois. It also stated that the investments were equities, commodities, precious metals, and currency, both in the futures and spot markets. In truth, EMHC never had trading accounts at TradeStation Securities or R.J. O'Brien. While EAGG did at one time hold accounts there, those accounts had ceased trading by the end of April 2005—before the defendants began soliciting pool participants and before the formation of EMHC.

None of EMHC's marketing materials state that any money would be sent out of the country, and Kratville did not tell potential pool participants that investments would be sent out of the country. Kratville told his friend Pat Shannon in October 2005 that if he told people about FXIG, no one would invest with the Elite Pools. In

an email dated August 30, 2006, Welke stated "[W]e both agreed . . . that it would be best if they didn[']t know who ou[r] people are . . . . [I] just think we should try to hold on as long as we can without giving out any names or info since that is our 'secret ingredient' which is our recipe for success . . . ." As to sales agents, Kratville told Shannon that EMHC could not hire anyone who had a license because "there are reporting rules for people with licenses if they are working with funds that are not licensed like ours." Kratville explained to Shannon that the sales agents that they were hiring "have connections with lots of rich people" and that they raised $1.5 million in 2005 "all in less than 4 months . . . hoping to hit $10 million in principal in 2006 . . . then we can all retire for real." (Second ellipsis in original.)

Between July 7, 2005, and April 30, 2006, EMHC received almost $2.3 million in funds from pool participants. The Elite Pools paid approximately $100,000 back to pool participants and sent $1.7 million to be traded on the Elite Pools' behalf. All of the Elite Pools' funds were commingled, and the Elite Pools were set up so that pool participants would share losses equally, based on the amount invested.

On May 15, 2006, Arrington received a letter from the NDBF regarding the investments that EMHC sold through its website, which he forwarded to Kratville. The letter referenced the EMHC website, asked for detailed business descriptions and copies of all promotional materials used, and inquired as to the identity of EMHC's traders. The letter stated that no offers or sales could continue until EMHC's legal status was determined.

Kratville contacted an attorney the following day about the NDBF's letter. In follow-up emails to that attorney, Kratville asked, "[I]f we open up another LP in another state, refund the money to Nebraska residents, and then have people give us back the money we just gave them to put into the new LP located outside [of] Nebraska . . . do you think that would suffice?" The attorney explained the

jurisdictional reach of the NDBF was broader than that. In a subsequent email from Kratville to Arrington, Kratville said:

> Despite [the attorney's] advice, I think the better course of action is to not refund the monies at this time and try and stretch out the discussion process as long as possible (I have some ideas on that) until the point where [they] likely [will] tell us to shut down.

* * *

> I am curious whether we need to consider LPs in just another state or whether we need to even move it offshore. Just an idea.

On May 25, 2006, Arrington, Kratville, and Welke created NIC, LLC (NIC) and MJM in Wyoming. MJM was to manage NIC as its commodity pool operator. Shortly thereafter, Kratville, Arrington, and Welke agreed that MJM, EMHC, and at least one of the Elite Pools would be permitted to open bank accounts in Iowa. Arrington, Kratville, and Welke jointly decided on bank accounts, traders, allocation of NIC funds, and how to report returns to participants. As with the Elite Pools, they did not register MJM as a commodity pool operator nor individually register as associated persons of MJM. MJM never registered or filed an exemption of registration with the CFTC. Kratville was the self-described vice president/managing partner of MJM, and he solicited on behalf of MJM and NIC.

During the last week in May 2006, Arrington, Kratville, and Welke held a meeting for the Elite Pool participants attended by 20 to 40 persons. At the meeting, Kratville stated that while the NDBF had issues with how the Elite Pools were set up, there was nothing wrong.

On June 16, 2006, Kratville and Welke met with the NDBF. At that meeting, Kratville and Welke represented that Arrington, Kratville, and Welke were the sole

-8-

officers of EMHC. Kratville represented that EMHC invested in commodities and currencies, but he did not mention FXIG. He told the NDBF that there were no pool participants from any other states; that no more than ten percent of a participant's principal was at risk at any one time; and that the EAGG had made at least five percent every month for 48 months.

The NDBF concluded that EMHC failed to disclose to investors the risks of investing in commodities; the details about the multi-million dollar offers to buy EMHC's trading system; information supporting the 48-month five-percent earnings claim, and Arrington's, Kratville's, and Welke's trading qualifications. The NDBF asked that the Elite Pools return the pool participants' money, both principal and gain. The NDBF explained that because EMHC was selling securities and that its structure, numbers, and representations were flawed, full rescission was the only adequate cure for the flaws. The NDBF warned that if EMHC did not agree to shut down and return all investor funds, then the NDBF would sue. Kratville and Welke agreed to follow the NDBF's directives and to notify Arrington.

The defendants, however, did not comply with the NDBF's directive. Instead, Kratville, Arrington, and Welke sent out two letters dated July 5, 2006, to every pool participant. The first letter, which the defendants provided to the NDBF as proof that the pools were complying with the NDBF's directive, stated that pursuant to cooperation with the NDBF, the Elite Pools would be closed and account balances returned to pool participants. The letter asked each pool participant to have the letter notarized, indicating that the pool participant had received his or her funds. The second letter, which was *not* provided to the NDBF, stated "[w]ith the dissolving of the current [Elite Pools], and you now joining NIC, LLC, we wanted to provide you with an accurate rollover balance. This is an internal document for you only. Do not provide this information to anyone." The letter listed the pool participant's balance and instructed the pool participant to contact Arrington, Kratville, and Welke with any questions.

Kratville made various comments about the letters to pool participants. Kratville emailed the letters to Voges, and, in conversations with Voges, Kratville explained that the NDBF did not like limited partnerships like the Elite Pools. Kratville explained to pool participant Gary McConnell that the opening of the new entity was necessitated by issues with the legal organization of the Elite Pools or a tax problem. Kratville told other pool participants that the rollover was a formality. When telling pool participants about the rollover, Kratville represented that everything would remain the same, including the traders and the risk limitation; the only thing that would change was the name. After the rollover, several of the pool participants of the Elite Pools became pool participants of NIC, which MJM managed.

On August 18, 2006, Kratville emailed Arrington and Welke about a follow-up letter that he had drafted to the NDBF. In that email, Kratville wrote, in relevant part:

> Morever, as I stated last night, we don[']t know if the state has gotten ahold of our bank records or not. I do assume not because if they had, I don[']t think their only response would be to call me with these questions. [I]t is quite clear to me that if the State ever finds out that we have the Wyoming entity and that we moved everyone over, that they will go after our nuts.

> Lastly, in an abundance of caution, I deleted anything on my computer that refers to FXIG or Elite. If the state would ever come grab our computers, the less on them the better. I would advise us to store any such documents on little zip drives, portable drives, on Hotmail or Yahoo accounts, etc. I don[']t have any of our emails in my Outlook or Outlook Express either. Better safe than sorry.

For several months preceding the fall of 2006, Arrington, Kratville, and Welke had been hearing that FXIG was in trouble. Kratville knew that FXIG had been refusing to honor withdrawals. In June 2006, the FXIG traders took the month off, and the website was unavailable for much of the summer. By late August or early

September 2006, FXIG posted that 41 percent of its funds were in open negative trades. In an email dated November 6, 2006, Kratville wrote to Arrington:

> On Red's point about results for October, I think we need better info from Fred and Ron before we post anything.
>
> Personally, I am conflicted on saying "we hit 5.07" (or whatever the real number was for October, I'm just using the Sept number) versus just saying "we met our goals" and then find out the real number was 2%.
>
> I think we all agree that we don[']t want to subsidize any more . . . . unless it is a very small %.
>
> The money with Dustin not being traded in October still bugs me a bit to . . . .

(Ellipses in original.)

By November 2006, FXIG reported the negative trade figure was 37 percent of the fund. In December 2006, FXIG announced that it would transfer all remaining funds to Sharndor Logistics and that dollars would be converted to units—each dollar of principal would be a class A unit and each dollar of growth would be a class B unit.

NIC participants received no notification of any problems with FXIG. They received statements showing returns of 6 percent for July 2006, 3 percent for August 2006, 6 percent for September 2006, 3.02 percent for October 2006, 3.5 percent for November 2006, and 3.07 for December 2006. But, in actuality, the true percentages were 3.89 percent for July 2006, 3.52 percent for August 2006, 0.28 percent for September 2006, 0 for October 2006, 0.17 percent for November 2006, and -7.76 percent for December 2006.

By February 2007, Sharndor Logistics posted that the funds received for FXIG investors were worth less than a penny on the dollar. Upon learning this information, Kratville emailed Arrington and Welke on February 11, 2007, that he was

> really frustrated because we are handling ot[he]r peoples' money and basically have had to hide these problems from our investors. The idea of doing an April 1st report scares the hell out of me because t[he] idea of lying has to be worse than anything right now. We can[']t keep digging a hole and hope to get out eventually.

The next day, Kratville emailed Arrington and Welke that he felt "like April 1st is a ticking time bomb because we can[']t go on saying nothing to our people but it is too early to tell them anything too." Arrington, Kratville, and Welke began discussing a variety of ways to try to recover the money. On February 13, 2007, Kratville emailed Arrington and Welke "a few ideas," which were in relevant part as follows:

> 2.      I don[']t know that hard ball gets us anywhere at all. It makes us feel bet[ter] but I really fear if t[he] authorities get involved that will d[i]minish our eventual net return. *More than that, I fear that someone will find out that we have been acting illegally too.*
>
> 3.      *If this thing blows up, I will lose my bar license.* So I am trying to be careful here. I can[']t afford to have this blow up. My other fear is that if th[is] blows up that I will lose all of my assets paying our members. *Playing hardball cou[ld] r[e]sult in t[he] state and feds finding out what we were doing* because they will look into all of the members to begin with if we turn Fred [Honea] in or if anybody turns him in.

(Emphases added.)

In an email dated February 25, 2007, Welke wrote to Arrington regarding Kratville's concerns, stating that

[Kratville] is most worried about what we are going to tell people in [A]pril. [H]e kept bringing up we need to be honest with our people, [I] don[']t know if that means we tell them where the money is or what, but . . . my opinion is we definit[ely] need to keep that to us at least till we figure what the hell is going on with the funds and how much we are going to get back . . . .

(Second ellipsis in original.)

In response, Arrington replied, in part, "I talked with kratty tonite. We talked about what you mentioned and my opinion as well (which is on trac w/you). . . . My personal opinion is Kratty will be ok. . . . [K]ratty doe[sn']t want to f**k anything up . . . as we don't so as much as he's freaked we can work with most of that."

Kratville grew increasingly concerned about what to report in the NIC's April 2007 report. On February 28, 2007, Kratville emailed Arrington and Welke that "it seem[s] like it is almost all gone. Which creates a hell of an issue for us come April 1st; the issue we hoped we wouldn[']t have to face but apparently will have to face after all." In another email that same day, Kratville acknowledged that the investments were almost gone and that they would be lucky to recover ten percent of their funds.

In March 2007, Honea posted that he tried to recoup losses but further withdrawals crashed the system and that he could not estimate how long that it would take to make the customers whole. During this time, Kratville met with NIC participant and longtime friend, BJ Tobin. Tobin was one of the two pool participants who knew about Honea and FXIG. Tobin expressed concern about whether NIC was in trouble "because of Fred Honea and FXIG's problems." Kratville replied that they "were using several traders, not just one and that as far as [Kratville] knew things with the other two were fine and that [he] had no information about how FXIG had done for a few months." Even though Kratville told Tobin that he had no information

about FXIG's problems, on March 18, 2007, Kratville emailed Arrington and Welke that "[m]aybe we should just file bankruptcy now." In another email that same day, Kratville stated, "Bankruptcy is the only option right now legally. But I am open to options."

Despite NIC's worsening problems as evidenced in the email exchanges, NIC participants received statements for the first three months of 2007 showing positive returns and no loss of principal. The statements showed a 3.20 percent return for January 2007, a 3.30 percent return for February 2007, and a 4.50 percent return for March 2007. The NIC's actual results were, taking into account the loss at FXIG in February 2007, 6 percent in January 2007,-79.27 percent in February 2007, and 6 percent in March 2007.

On April 18, 2007, Kratville emailed Arrington and Welke about the necessity of coming up with a timeline to show "when F[red Honea] locked the accounts from taking money out . . . what we did to deal with Fred, to obtain more info, to press him for more info, etc." The next day, Kratville emailed Arrington and Welke concerning the posting of results for the first quarter. Kratville suggested that, based on concerns as to whether they could ever withdraw money from FXIG, they should post something on the website "that won['t] arouse a lot of suspicion but gives us t[he] chance to deal with Fred [Honea] one last time." The suggested statement was,

> "In auditing all 3 of our traders' information for the first quarter, we have a few questions that we want to go over with one of the traders and after we do so, we may post a different number for the quarter. We will update you as soon as possible."

That same day, Welke emailed Arrington about Kratville, stating, "U boy is going to go postal soon . . . . lock down." (Ellipsis in original.)

NIC participants received statements falsely reporting 3.01 percent growth for April 2007, 3.04 percent growth for May 2007, and 3.03 percent growth for June 2007, when the pool actually suffered substantial losses in each of those months. The percentages reported should have been -5.95 percent, -10.61 percent, and -26.11 percent for April, May, and June 2007, respectively.

Beginning as early as October 2007 and through as late as January 2008, NIC participants learned of the loss of the value of their accounts.[7] By the end of 2007, Arrington, Kratville, and Welke had collected $4.6 million in pool participants' funds, paid out $850,000 in "returns" to existing pool participants, and had sent out a net of approximately $3 million to trading entities. As NIC participants learned of the loss or suspected something was wrong, many contacted Kratville, who told them that he never joined MJM or NIC. Kratville provided the CFTC with documents purportedly showing his resignation from MJM and NIC on June 23, 2006. Kratville drafted the resignation documents, which included stipulations that he continue to be informed about any traders that MJM or NIC used; that any information that he learned about MJM, NIC, or their traders would be kept confidential; that he would not disclose his resignation to any one; that he would not compete with EMHC, NIC, or MJM; and that EMHC, NIC, or MJM would pay for his golf club membership dues through July 2007.

The CFTC filed suit on May 11, 2011, alleging that Arrington, Kratville, and Welke "us[ed] numerous investment pools operated" by EMHC and MJM—unregistered commodity pool operators—to "orchestrate[] a fraudulent

---

[7]In total, there were 112 pool participants, counting couples as one pool participant.

-15-

scheme that induced more than 130 pool participants . . . to invest at least $4.7 million in the pools," in violation of the CEA.[8]

Discovery in this case commenced in August 2011 and closed on April 29, 2013. On April 16, 2013, a grand jury indited Kratville, charging him with 14 counts of fraud and related crimes based on substantially the same facts as this civil case.[9] On May 23, 2013, the CFTC moved for summary judgment on all counts, which the district court granted on the merits after rejecting several of Kratville's evidentiary challenges. Kratville moved to alter or obtain relief from the judgment under Federal Rules of Civil Procedure 59(e) and 60(b)(1) and (6), renewing points raised in his opposition to the motion for summary judgment and seeking relief on the ground that his former attorney committed excusable neglect by advising him to invoke the Fifth Amendment at his deposition following his criminal fraud indictment and by not more aggressively pursuing discovery. The court denied the motion.

---

[8]Specifically, the CFTC alleged that the defendants committed fraud in connection with futures, in violation of 7 U.S.C. § 6b(a)(2)(i)–(iii) (2006) and 7 U.S.C. §§ 6b(a)(1)(A)–(C) and 6b(a)(2)(A)–(C); committed commodity-pool fraud, in violation of 7 U.S.C. § 6*o*(1) (2006) and 17 C.F.R. § 4.41 (2010); committed fraud in connection with options, in violation of 7 U.S.C. § 6c(b) (2006) and 17 C.F.R. § 33.10 (repealed June 26, 2012); failed to register as a commodity pool operator, in violation of 7 U.S.C. § 6m(1)(2006); and failed to register as an associated person of a commodity pool operator, in violation of 7 U.S.C. § 6k(2) (2006). The CFTC also alleged that the individual defendants were liable as controlling persons for the violations of EMHC and MJM under 7 U.S.C. § 13c(b).

[9]On December 4, 2014, Kratville pleaded guilty to Count 9 of the indictment, which charged wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 13 and 2. *See United States v. Arrington, Kratville, and Welke*, No. 13-cr-00146 (D. Neb.). On June 18, 2015, the district court sentenced Kratville to 48 months' imprisonment.

II. *Discussion*

On appeal, Kratville argues that the district court erred in (1) denying his request for more time to review purportedly new evidence; (2) considering affidavits from investors who signed releases, affidavits from investors who lacked credibility, and emails that could have been altered; (3) declining to consider the affidavit of an expert opining on the authenticity of the emails; (4) granting summary judgment on the CFTC's claim that Kratville committed fraud and related violations of the CEA and CFTC regulations in soliciting persons to invest and maintain funds in commodity investment pools; and (5) determining that the litigation strategy of Kratville's attorney was not excusable neglect warranting relief under Federal Rule of Civil Procedure 60(b)(1).

A. *Time To Review Evidence*

Kratville argues that the district court abused its discretion in refusing to permit him sufficient time to review over 78,000 pages of evidence that the "government" provided to him two months after discovery closed.

Discovery in this case closed on April 29, 2013. In the meantime, on April 16, 2013, Kratville was criminally indicted. On May 23, 2013, the CFTC moved for summary judgment on all counts. In June 2013, two months after Kratville's criminal indictment, the *United States Attorney's Office* in the *criminal case* produced a CD ROM of Arrington's hard drive containing emails and other documents and provided it to Kratville's counsel.[10] Several months prior, the CFTC had produced hard copies

---

[10]Kratville averred that

about June 17, 2013, the United States Attorneys office delivered to Affiant's attorneys' office a CD ROM purportedly containing a copy of the files on Defendant Jon Arrington's hard drive (and containing other files as well) but not a copy of the actual hard drive itself. This CD ROM contained 18,636 separate PDF files totaling 78,680 pages of documents in PDF format.

of those emails that it had received from Arrington. Kratville's response to the CFTC's motion for summary judgment was due on July 11, 2013. On that date, Kratville moved for an extension of time to respond to the CFTC's motion for summary judgment based on the evidence that the *United States Attorney's Office* produced in the criminal case. Kratville asserted that he had retained an expert to examine the hard drive to see if Arrington's emails were fake or had been altered. Kratville also submitted a brief in opposition to the CFTC's motion for summary judgment based on the existing evidence.

On July 12, 2013, the CFTC opposed Kratville's motion for extension of time. It argued that although Kratville had 51 days to respond to its motion for summary judgment, Kratville waited until the day his response was due to request additional time. It also asserted that Kratville failed to explain why he "need[ed] an expert now, after the close of discovery, instead of when he first saw the Arrington emails that he now claims are fake." The CFTC pointed out that Kratville had received the Arrington emails in its possession on February 28, 2013, and that the CFTC had used these emails as exhibits in Kratville's deposition on March 29, 2013. As a result, the CFTC maintained that "[i]f Kratville believed these emails were fake, he should have designated an expert at that time, or at the very least mentioned to the CFTC he was considering getting an expert." The CFTC asserted that "because the emails are from Kratville, he was in a unique position to know whether" he had written them. That same day, the district court denied as moot Kratville's motion for an extension of time given that "Kratville went ahead and filed a brief responding to the summary judgment motion."

On August 15, 2013, Kratville moved to defer consideration of the CFTC's motion for summary judgment. In that motion, Kratville argued that "David Burgess, a computer forensic expert, was provided copies of co-Defendant Jonathan Arrington's computer hard drives by the United States Attorney's Office for the District of Nebraska–Omaha Division" and that Burgess was "in the process of

-18-

conducting an analysis and examination of co-Defendant Jonathan Arrington's computer hard drive, in order to determine the authenticity of certain email correspondence, which was relied upon by [the CFTC] in its Motion for Summary Judgment." Kratville asserted that he could not "present facts essential to justify his opposition" to the CFTC's motion for summary judgment "without further knowledge regarding the authenticity of said email correspondence which was utilized against him in [the CFTC's] Motion for Summary Judgment." Kratville asked the court to defer considering the motion for summary judgment—which was filed on May 23, 2013—until November 15, 2013.

The district court denied Kratville's motion to defer consideration of the CFTC's motion for summary judgment, stating,

> As Kratville acknowledges, he has been in possession of hard copies of the subject emails since at least March of 2013. Yet, he waited until June, 2013, to locate Arrington's computer in an effort to complete the forensic analysis. Discovery in this case closed on April 29, 2013. Kratville has not acted diligently in pursuing the requested discovery, and the Court will not provide him additional time to gather evidence which could have been obtained much earlier.

Kratville first argues that the CFTC violated Federal Rule of Civil Procedure 26(e)(1)(A) by not supplementing disclosure when information "has not otherwise been made known to the other parties during the discovery process." According to Kratville, "[t]here is no indication that the existence of Arrington's hard drive was disclosed to Appellant prior to late June 2013. Appellee had a duty to disclose it and never did so until it was produced by the government in June 2013[,] almost 2 months *after* discovery had been completed."

But Kratville is conflating his criminal case with his civil case and the United States Attorney's Office with the CFTC. The United States Attorney's Office—not the CFTC—produced the CD ROM in June 2013. The CFTC represents that it was

unaware of Arrington's hard drive, and Kratville has offered no evidence that the CFTC was aware of its existence.

Kratville next argues that he was entitled to a continuance for additional discovery pursuant to Federal Rule of Civil Procedure 56(d). "Under Rule 56([d]),[11] a party may seek 'an extension of time in which to respond to the motion[ ] [for summary judgment] in order to complete further discovery.'" *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 792 (8th Cir. 2012) (second and third alterations in original) (quoting *Marksmeier v. Davie*, 622 F.3d 896, 903 (8th Cir. 2010)). This court reviews a denial of a continuance motion under Rule 56(d) for an abuse of discretion. *Id*.

Kratville sought continuance under Rule 56(d) to enable his expert to review the hard drive that the United States Attorney's Office had produced in the criminal case. In denying the motion, the district court stated, "As Kratville acknowledges, he has been in possession of hard copies of the subject emails since at least March of 2013." Kratville does not contest that the CFTC produced all of the hard copies of Arrington's emails that it had in its possession. Having the hard copies of these emails, Kratville could have sought the source of these emails and would have known upon reading them whether he authored the ones showing him as the sender. As the CFTC notes, Kratville waited until three weeks before the close of discovery to request documents from Arrington and never deposed him. More importantly, Kratville has not shown how the documents are material to summary judgment in the present case; that is, Kratville has not "affirmatively demonstrat[ed] . . . how postponement of a ruling on the motion will enable him, by discovery or other means,

---

[11] "Rule 56(f)—recodified 'without substantial change' as Rule 56(d) effective December 1, 2010—authorizes a district court to defer considering a motion for summary judgment if a party opposing the motion 'shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Chambers v. Travelers Cos., Inc.*, 668 F.3d 559, 568 (8th Cir. 2012).

to rebut the movant's showing of the absence of a genuine issue of fact." *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010) (quotation and citation omitted) (second alteration in original). Accordingly, we hold that the district court did not abuse its discretion in denying Kratville more time to review the documents contained on the CD ROM that the United States Attorneys' Office produced in his criminal case for purposes of the CFTC's summary-judgment motion.

### B. *Consideration of Affidavits and Emails*

Kratville next challenges the district court's consideration of several affidavits in deciding the CFTC's motion for summary judgment. We review for an abuse of discretion the district court's consideration of affidavits when ruling on a motion for summary judgment. *Malone v. Ameren UE*, 646 F.3d 512, 515 (8th Cir. 2011).

### 1. *Affidavits from Pool Participants Who Settled Lawsuits with Defendants*

Kratville asserts that the district court improperly granted summary judgment to the CFTC because some investors who provided affidavits in support of the CFTC's motion for summary judgment had brought private lawsuits against him, settled their cases for compensation, and signed releases. According to Kratville, the district court disregarded Nebraska law by refusing to enforce these releases and considering those investors' affidavits.

Rarely will privity be found "between a private party in one action and a party in a later action when the party in the later action is a governmental agency." *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1290–91 (11th Cir. 2004). Furthermore, "It is a well-established general principle that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *Id*. at 1291 (quotation and citation omitted). The doctrine of res judicata does not bar the government "'from maintaining independent actions asking courts to enforce federal statutes implicating both public and private interests merely because independent private litigation has also been

-21-

commenced or concluded.'" *Id*. (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 692 (7th Cir.1986) (en banc)). "[G]overnmental agencies have statutory duties, responsibilities, and interests that are far broader than the discrete interests of a private party." *Id*.

Applying these principles, we agree with the district court that it was not barred from considering the investors' affidavits in support of the CFTC's motion for summary judgment because the CFTC was not a party to the settlement agreement between the investors and Kratville. Instead, the present case involves the CFTC

> seek[ing] to protect a public interest that far exceeds the interests of individual citizens. That is, the [CFTC] seeks to protect the integrity of a public market. The continued integrity and hence vitality of that public market has huge implications for the national economy.
>
> Therefore, even though a private litigant "understandably" may believe it wise "to compromise claims to gain prompt and definitive relief," such a settlement "does not further the broader national public interests represented by the [CFTC] and reflected in Congress's delegation of [the Act's] enforcement powers to the [CFTC.]" [*Herman v. S.C. Nat'l Bank*, 140 F.3d 1413,] 1426 [(11th Cir. 1998)]. Indeed, and quite apart from whether the individual victims are satisfied with their private settlements, full and ample restitution, and other equitable remedies such as disgorgement of profits, serve distinct deterrence functions that are vital to the "national public interest." *Id*. Therefore, when private parties settle their disputes without the approval or consent of the [CFTC], those settlements cannot preclude the [CFTC] from later seeking additional or more full restitution or any other remedy.

*CFTC v. Comm'l Hedge Servs., Inc.*, 422 F. Supp. 2d 1057, 1060–61 (D. Neb. 2006) (fourth alteration in original).

2. *Affidavits from Pool Participants Who Kratville Claims Lack Credibility*

-22-

Kratville also argues that the district court abused its discretion in admitting the affidavits of pool participants Tony Leach and Pat Shannon because, he believes, their credibility is questionable.

Leach averred that in August 2007, he went on vacation with Kratville's sister, Catherine Kratville ("Catherine"), who told him that "Kratville had indicated to her that NIC was in serious trouble, and that [Leach] should get [his] money out." Leach also averred that Catherine "told [him] that if [he] repeated this, she would have [him] killed." Kratville argues that Catherine's affidavit calls into question Leach's credibility because Catherine denied "ever tell[ing] Anthony Leach that if he told anything to anyone that I would kill him or have him killed" and "ever hav[ing] any conversations with Anthony Leach about Elite or NIC or MJM or Leach's investment in one or more of those entities."

As to Shannon's affidavit, Kratville submitted an affidavit from Burgess in which Burgess averred that he had examined Shannon's affidavit and emails attached to Shannon's affidavit, as well as electronic versions of emails directly from Kratville's computer. "After such examination, [Burgess] concluded that Shannon was not telling the truth about the subject of the emails of that date Shannon sent to Kratville which contain the email of that date attached to Shannon's affidavit." Kratville also offered the affidavit of Joseph Boeggeman, who knew both Kratville and Shannon. Boeggeman averred that he had informally mediated a legal fee dispute between Shannon and Kratville, gave a different interpretation of some emails that Shannon discussed in Shannon's affidavit, and expressed his general view that Shannon was not honest.

In the present case, the CFTC, "the party with the burden of proof," is the movant, and Kratville is "the opposing party present[ing] evidence contesting the veracity of the movant's evidence." *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 845 (8th Cir. 2007). "In this

-23-

situation, if the testimony of a witness . . . is necessary to carry the movant's burden of proof, we look carefully at whether the witness is unbiased and competent, and whether his testimony is positive, internally consistent, unequivocal, and in full accord with the documentary exhibits." *Id*. (quotation and citation omitted). Summary judgment is not proper "where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt." *Id*. (quotation and citation omitted).

Like the district court, we reject Kratville's credibility challenge to the CFTC's use of Leach's and Shannon's affidavits. As the district court noted, the CFTC did not allege any fact, and the district court did not rely on any fact, "based solely on Leach's affidavit." As to Shannon's affidavit, we agree with the district court that Kratville "failed to allege specific facts calling into question Shannon's credibility." General allegations that "Shannon has a history of failing to fully disclose the truth with respect to business dealings" and Kratville's argument that "Boeggeman's affidavit calls into question the veracity of Shannon's affidavit and his credibility in general" lack specificity. Furthermore, as the district court observed, "Kratville admitted or did not contest the CFTC's statement of material facts with respect to many of the issues touched upon in Shannon's affidavit. Matters Kratville did contest are not material to CFTC's burden of proof, and relate only to differing interpretations of documents."

### 3. *Arrington's Emails and the Expert's Affidavit*

Kratville next claims that the district court erred in considering emails exchanged between him, Arrington, and Welke that were attached to Arrington's affidavit that was submitted in support of the CFTC's motion for summary judgment. He also claims that the court erred in refusing to consider the affidavit of Burgess, his expert on the authenticity of the emails. Kratville argues that these emails may have been altered based on Burgess's averment that he had conducted a "cursory" review of hard copies of Arrington's emails and concluded that "portions of some" have been deleted.

The district court refused to consider the Burgess affidavit based on Kratville's failure to timely disclose Burgess as an expert, explaining:

> Kratville disclosed Burgess as an expert the day before he filed his response to the CFTC's Motion for Summary Judgment. He has not provided any justification for this untimely disclosure. Kratville received the hard copy emails during discovery, and the emails were used as exhibits during Kratville's deposition on March 29, 2013. Kratville had more than sufficient notice of the emails, many of which were written by him, and adequate time to question their authenticity. Kratville has not demonstrated that his failure to disclose his forensics expert was substantially justified or harmless. Accordingly, Kratville has failed to provide specific facts challenging Arrington's credibility, and the Court has considered the Arrington affidavit and emails in its analysis of the CFTC's Motion.

Reviewing the district court's exclusion of the Burgess affidavit for an abuse of discretion, *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998), we conclude that the district court did not err in disregarding Burgess's affidavit and thus rejecting Kratville's challenge to the authenticity of the emails that Arrington attached to his affidavit. As the district court explained, Kratville *failed* to timely disclose Burgess as an expert pursuant to Federal Rule of Civil Procedure 26(a). "'A party that . . . fails to disclose information required by Rule 26(a) . . . shall not be permitted to use [the nondisclosed information] as evidence at a trial, at a hearing, or on a motion' 'unless such failure is harmless' or there was 'substantial justification' for the failure." *Trost*, 162 F.3d at 1008 (quoting Fed. R. Civ. P. 37(c)(1)). Kratville has not shown that the failure to disclose Burgess was harmless or that he had a substantial justification for the failure. As explained *supra*, the CFTC had shown Kratville the emails appended to Arrington's affidavit months before in a deposition; therefore, he could have retained an expert at that time to review the authenticity of the emails.

C. *Violation of the CEA*

-25-

Kratville argues that the district court erroneously granted summary judgment to the CFTC on its claim that Kratville committed fraud in violation of the CEA and its implementing regulations. "We review a district court's grant of summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (citation omitted).

"In order to establish liability for fraud, CFTC had the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002) (citations omitted).[12] "In applying these various elements to the present case, we are guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Id*. at 1329 (citing *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000)). The question is whether the "undisputed facts demonstrate fraud and deception as a matter of law." *Id*.

1. *Misrepresentation, Misleading Statement, or Deceptive Omission*

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *Id*. at 1328 (quoting *Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617, 36,657 & n.12 (CFTC Mar. 1, 1990)). Thus, we read the information "for its *overall message*, and how that message would be interpreted by an objectively reasonable" receiver of that information. *Id*. at 1329.

---

[12]As the district court correctly observed, "[t]here are few elemental differences between the CFTC's various fraud claims." Therefore, we will analyze the same elements for the fraud claims brought against Kratville under the CEA and its implementing regulations. *See R.J. Fitzgerald*, 310 F.3d at 1328.

Here, the district court cited the following "uncontroverted evidence" as satisfying the CFTC's burden of proving that Kratville made misrepresentations. First, the district court found that "[t]he overall message of representing FXIG's purported track record as that of EMHC or the Elite Pools was misleading." The following undisputed facts support this finding. Kratville told prospective pool participants in the fall of 2005 that the *Elite Pools* had returned at least four to six percent per month since 2002 when the EIIG did not begin trading until 2003 at the earliest and the EAGG was not established until 2004. Additionally, it was FXIG, not the Elite Pools, that reported the four-to-six percent returns. EMHC's website and brochures also represented that EMHC received multiple million-dollar offers to purchase its system when, in reality, neither EMHC nor any of the Elite Pools had a proprietary trading system, and the defendants never received any offers to purchase such a system. Kratville is liable for these representations, as he was an equal officer and owner of EMHC and MJM.

On appeal, Kratville argues that it was not misleading for EMHC to list the reported achievements of its traders at FXIG because all club members knew that outside traders were being used. But, as the district court noted, "[t]he issue is not whether the representations accurately described FXIG's track record, but whether it was misleading to represent FXIG's track record as that of EMHC, without mentioning FXIG." First, it is undisputed that neither EMHC nor any of the Elite Pools earned the reported returns through their own trading, which is what the marketing materials represented. Second, Kratville told a friend that if he told people about FXIG, no one would invest with the Elite Pools.

Third, the district court also found that Kratville and the defendants made explicitly false representations apart from misrepresenting FXIG's purported record as its own. The following undisputed facts support this finding. The prospectus provided that EMHC's primary broker was TradeStation Securities and its clearing

house broker was R.J. O'Brien when EMHC never had trading accounts with those entities.

Finally, the district court found that Kratville made personal representations that were either false or misleading to investors. The following undisputed facts support this finding. Kratville represented to investors that he was an active, longterm investor in EMHC. In reality, Kratville was an investor in EAGG under Neil Labelle, but he received his money back at a loss in May 2005. Once EMHC began operating the Elite Pools, Kratville deposited, at most, $500 of his money in August 2005. Additionally, Kratville did not disclose to the pool participants the NDBF's directive to shut down EMHC and return all investor money; instead, Kratville and the other defendants falsely told pool participants that the NDBF merely had some technical concerns about the pools' structure that had been rectified by reconstituting the pools and rolling over the investors' money to a new pool.

In summary, we agree with the district court that "[t]he undisputed evidence demonstrates that the 'overall message' and the 'common understanding of the information conveyed' to investors while recruiting and managing the Elite and MJM pools was deceitful." (Quoting *R.J. Fitzgerald*, 310 F.3d at 1328.)

## 2. *Scienter*

"For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328 (citation omitted). The CFTC proves scienter by showing that the "Defendant's conduct involves 'highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.'" *Id*. (alterations in original) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

-28-

We agree with the district court that "[t]he CFTC has presented uncontroverted evidence of scienter." First, in 2005, Kratville admitted to a friend that if he told people about FXIG, then no one would invest with the Elite Pools. Second, in 2006, Kratville's correspondence with Arrington and Welke regarding the NDBF investigation undisputably demonstrates scienter; the district court accurately recounted this correspondence as follows:

> After receiving the NDBF inquiry, Kratville recommended that an attorney's advice be disregarded, stating "I think the better course of action is to not refund the monies at this time and try and stretch out the discussion process as long as possible (I have some ideas on that) until the point where [they] likely [will] tell us to shut down . . . . I am curious whether we need to consider LPs in just another state or whether we need to even move it offshore. Just an idea." (Filing No. 102-6 at ECF 41.) Kratville, Welke, and Arrington followed through with this scheme and created MJM and the NIC Pools. On August 18, 2006, Kratville emailed Arrington and Welke, stating "it is quite clear to me that if the State ever finds out we have the Wyoming entity and we have moved everyone over, that they will go after our nuts." (Filing No. 102-6 at ECF 44.) Kratville advised that, "in an abundance of caution, I deleted everything on my computer that refers to FXIG or Elite. If the state would ever come grab our computers, the less on them the better. I would advise us to store any such documents on little zip drives, portable drives, on Hotmail or Yahoo accounts, etc." (*Id*.) He further stated he did not "have any of our emails in" his Outlook, and "[b]etter safe than sorry." (*Id*.) These statements evidence an intent to keep the scheme in place as long as possible and avoid detection as long as possible.

(Alterations in original.)

Third, after Kratville learned in February 2007 that FXIG would return less than a penny on the dollar, Kratville emailed Arrington and Welke that he was "really frustrated because we are handling ot[he]r peoples' money and basically have had to

hide these problems from our investors." Also, in his email to Arrington and Welke regarding ways to recover the money, Kratville stated that he feared that "someone will find out that we have been acting illegally too . . . If this thing blows up, I will lose my bar license. . . . My other fear is that if th[is] blows up that I will lose all of my assets paying our members. Playing hardball cou[ld] r[e]sult in t[he] state and feds finding out what we were doing . . . ."

Fourth, Kratville collaborated with Arrington and Welke on whether to report the losses during the first half of 2007 and recommended that they report something that "won[']t arouse a lot of suspicion."

On appeal, Kratville contends that a genuine issue of material fact exists as to his scienter based on the emails between Arrington and Welke about Kratville and at least one email from Kratville to Arrington purportedly showing Kratville expressing concern about the funds' performance and a desire to be truthful. For purposes of summary judgment, we assume the veracity of these emails. But we must examine "the record as a whole" to determine whether "a rational trier of fact [could] find for the nonmoving party"; if not, then "there is no genuine issue for trial." *Kiemele v. Soo Line R. Co.*, 93 F.3d 472, 474 (8th Cir. 1996) (quotation omitted). Here, the record as a whole, as best evidenced by Kratville's own words in his email exchanges with Arrington and Welke, demonstrate his scienter. There is no genuine issue of material fact for a jury to decide.

Kratville also claims that material issues of fact exist as to whether he was a controlling person of EMHC and MJM. He contends that he presented evidence that he either did not know about the misrepresentations, objected to them, or was barred by ethics rules from correcting any misrepresentations that his codefendants, as his clients, made.

-30-

An individual "who, directly or indirectly, controls [a corporation that] has violated [the CEA] may be held liable for such violation in any action brought by the Commission to the same extent as such controlled [corporation]." 7 U.S.C. § 13c(b).

> For liability to attach, the Commission must prove: (1) that a corporation violated the Act; (2) that the defendant "directly or indirectly" controlled that corporation; and (3) that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C.A. § 13c(b).

*CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002).

The Commission establishes that a defendant controlled a corporation under § 13c(b) by showing "that the defendant actually exercised general control over the operation of the entity principally liable *and* possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Id.* (quotation and citations omitted). The facts and circumstances dictate whether a defendant possessed such "control." *Id.* (citations omitted). "Because control may be exercised jointly by a group, several persons may simultaneously be controlling persons of the same corporation." *Id.* (citation omitted). However, "in every case, the controlling person must have *actually* exercised general control over the operation of the entity principally liable." *Id.* (quotation and citation omitted). One who "actually direct[s] a corporation or cause[s] it to act" may be liable as a controlling person and cannot "otherwise hide behind formalities of ownership or title." *Id.* (citation omitted). It is the person's "power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993) (citation omitted). A controlling person "knowingly induced" the conduct if he "had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." *R.J. Fitzgerald*, 310 F.3d at 1334 (citation omitted).

-31-

The undisputed facts show that Kratville is liable as a controlling person. First, EMHC's and MJM's default judgment serves as the predicate source of entity liability for violations of the CEA and its regulations.

Second, Kratville controlled EMHC and MJM. Kratville admitted that he was an owner and officer of EMHC and MJM. He jointly operated these entities with Arrington and Welke and jointly selected with them the traders and financial institutions that EMHC and MJM used. He solicited pool participants with Arrington and Welke to invest in the companies' pools and jointly prepared marketing materials and trading statements with them for EMHC and MJM. He served as legal counsel for EMHC and the Elite Pools and represented them in dealings with the NDBF.

Finally, the undisputed facts show that Kratville knowingly induced the entities' fraud, as shown by the evidence set forth *supra* establishing his scienter. Therefore, we hold that the district court correctly determined that Kratville is liable as a controlling person.

### 3. *Materiality*

"A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328–29 (citations omitted). "It is too obvious for debate that a reasonable listener's choice-making process would be substantially affected by emphatic statements on profit potential . . . ." *Id*. at 1330. "When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers." *Id*. (quotation and citation omitted). As a result, "representations about profit potential and risk '*go to the heart of a customer's investment decision* and are therefore material as a matter of law.'" *Id*. (quoting *CFTC v. Noble Wealth Data*, 90 F. Supp. 2d 676, 686 (D. Md. 2000)).

The district court found that Kratville's misrepresentations and omissions were material, and the undisputed facts support this finding. Kratville's misrepresentations related to profit potential and risk. Kratville misrepresented the Elite Pools's returns and profitability as late as 2006 and 2007, misrepresented the identity of the Elite Pools's brokers, and misrepresented that the Elite Pools owned a proprietary trading system. He hid from investors that pool funds were being sent out of the country and failed to disclose that the NDBF had ordered the Elite Pools to be closed and pool participants funds to be returned.

Because the CFTC satisfied its burden of proving that Kratville violated the CEA, we affirm the district court's grant of summary judgment to the CFTC.

## D. *Excusable Neglect*

Kratville argues that the district court erroneously denied his Rule 60(b) motion for relief from judgment based on his former attorney's "excusable neglect." He identifies the following areas in which his trial attorney was purportedly neglectful: (1) failing to file motions on some issues; (2) not filing motions on a timely basis on some issues; (3) not resetting Kratville's deposition so that evidence could be offered; (4) telling Kratville that taking the Fifth Amendment would not be a problem in defending against summary judgment when such was clearly wrong; and (5) not having Kratville file an affidavit in July 2013 that would have controverted many facts in this case.

"The denial of a Rule 60(b) motion is reviewed for an abuse of discretion." *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 496 F.3d 863, 866 (8th Cir. 2007) (citing *Noah v. Bond Cold Storage*, 408 F.3d 1043, 1045 (8th Cir. 2005)). "[B]ecause Rule 60(b) authorizes relief in only the most exceptional cases," we will rarely reverse a district court's denial of a Rule 60(b) motion. *Id.* (quotation and citation omitted).

"Rule 60(b)(1) permits, *inter alia*, a district court to grant relief from a judgment entered because of a party's excusable neglect." *Id.* (citing *Noah*, 408 F.3d at 1045). We have identified two components of excusable neglect: "(1) neglect or noncompliance . . . (2) that is excusable." *Id.* (citing *Noah*, 408 F.3d at 1045). We consider several factors in analyzing whether conduct is "excusable":

> (1) the danger of prejudice to the non-moving party; (2) the length of the delay and its potential impact on judicial proceedings; (3) whether the movant acted in good faith; and (4) the reason for the delay, including whether it was within the reasonable control of the movant. *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). These four *Pioneer* factors do not carry equal weight; the reason for delay is a key factor in the analysis. *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 463 (8th Cir. 2000).

*Id.* (internal footnote omitted).

Rule 60(b)(1) "does not permit litigants and their counsel to evade the consequences of their legal positions and litigation strategies, even though these might prove unsuccessful, ill-advised, or even flatly erroneous." *McCurry ex rel. Turner v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002). Additionally, "'Rule 60(b) has *never* been a vehicle for relief because of an attorney's *incompetence or carelessness*.'" *Inman v. Am. Home Furniture Placement, Inc.*, 120 F.3d 117, 119 (8th Cir. 1997) (emphasis added) (quoting *Sutherland v. ITT Cont'l Baking Co.*, 710 F.2d 473, 476–77 (8th Cir. 1983)).

Here, the district court denied Kratville's Rule 60(b)(1) motion, finding that significant delay would result from granting the motion and that counsel's professional carelessness did not warrant relief. The district court did not err in denying Kratville's Rule 60(b) motion. Even assuming that Kratville showed counsel's neglect or noncompliance, as opposed to showing that counsel was simply

executing a litigation strategy, the district court adequately explained why the conduct is not "excusable." Had the court granted Kratville's motion, extreme prejudice to the CFTC and significant delay would have resulted from the CFTC having to depose Kratville again to obtain responses to the questions that Kratville previously refused to answer, and the CFTC would likely have had to conduct additional discovery to evaluate Kratville's answers or relitigate previously resolved issues. Kratville has failed to provide any justification for this delay beyond the negligence, carelessness, or incompetence of his attorney.[13]

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[13] Kratville argues that his "former attorney's actions were negligent because they misled [Kratville] into asserting the 5th Amendment when there was no way to otherwise counter [the CFTC's] evidence." (Internal footnote omitted.)