# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1972

_____

| | | |
|---|---|---|
| Janice S. Hope, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Mirek Klabal, also known as Miroslav | * | District of Minnesota. |
| Klabal; Lynn G. Epsteen, also known as | * | |
| Lynn Tescher, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: March 14, 2006
Filed: August 7, 2006

_____

Before WOLLMAN, JOHN R. GIBSON, and ARNOLD, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Janice Hope appeals from two orders of the district court[1] granting summary judgment to Mirek Klabal and Lynn Epsteen on her claims arising out of a series of art transactions. She alleges that she purchased artwork from Klabal and Epsteen at fraudulently inflated prices and seeks some $10 million in damages. The district court ruled that all of Hope's claims were barred by their respective statutes of limitations,

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

except with respect to a single art transaction between Hope and Klabal. Hope argues on appeal that the district court misapplied the discovery rule and the law of fraudulent concealment, erred in finding that the continuing tort doctrine did not apply, and erred in applying the law of the case when issuing its summary judgment order as to Epsteen. We affirm.

I.

We state the facts in the light most favorable to Hope. In 1984, Klabal approached Hope, a close friend of his wife, about purchasing investment art from him. Klabal held himself out as an art expert and told Hope that he would be able to acquire art for her at prices substantially below fair market value. From 1984 through 1998, Hope purchased approximately 100 pieces of artwork from Klabal for a total of more than $8 million. These pieces included works of art by major figures in the modern and pop art fields, including Pablo Picasso, Alexander Calder, Marc Chagall, Willem de Kooning, Roy Lichtenstein, Henri Matisse, and Andy Warhol. While a few of the individual purchases were priced below $10,000, Hope purchased many of the pieces for more than $100,000. For each piece, Klabal provided Hope with an invoice, a certificate of authenticity, and an insurance evaluation stating the "current international value" of the piece. These values exceeded the prices that Hope paid for the pieces. In many instances, Hope purchased the artwork "sight unseen," based solely on Klabal's representations, and in certain instances Klabal never delivered works that Hope had purchased, claiming that he had found them to be forgeries, that he would trade them for more valuable pieces, or that it was in Hope's best interests for him to retain them.

Klabal also introduced Hope to Epsteen, who similarly represented that her expertise would enable her to obtain art for Hope at significant discounts. From 1987 through 1994, Hope purchased seven pieces of art from Epsteen for a total of over $2.1 million. Six of the pieces were works by Andy Warhol, and one was a piece by

Pablo Picasso. Epsteen issued written invoices and certificates of authenticity for these pieces, along with a letter containing an appraisal "made solely for insurance purposes" and a statement describing how to obtain full appraisals from the Art Dealers Association of America. Again, as with the insurance evaluations obtained from Klabal, the amounts listed were much higher than what Hope actually paid for the pieces.

In 1997, Hope advised Klabal that she wanted to sell some of the art in order to diversify her investment portfolio. Although Klabal told Hope that he would make every effort to sell the art, no sales occurred until a year or two later, when Hope was able to sell sixteen pieces at Sotheby's through Klabal and Epsteen. All but one piece of art was sold at a substantial loss. Hope later hired an independent art expert, Dr. Elin Lake Ewald, to evaluate 23 pieces that she had purchased from Klabal. Dr. Ewald completed a report in October 2000, concluding that Hope had purchased the artwork at prices significantly above fair market value at the times of purchase. Dr. Ewald also evaluated the works Hope had purchased from Epsteen and advised her that six of the seven pieces were purchased at inflated prices.

On June 19, 2002, Hope filed a 45-page complaint against Klabal and Epsteen alleging fraud, conspiracy to defraud, breach of fiduciary duty, conversion, breach of contract, negligent misrepresentation, consumer fraud, deceptive trade practices, and violations of 18 U.S.C. § 1964 (RICO). The complaint listed more than one hundred pieces of art Hope had bought from Klabal, as well as the seven pieces of art she purchased from Epsteen. In lieu of an answer, Epsteen filed a motion to dismiss, while Klabal answered and later filed a motion for summary judgment. Following a hearing, the magistrate judge issued a report and recommendation, later adopted by the district court, finding that Hope's claims against Epsteen should be dismissed without prejudice and that Klabal's motion for summary judgment should be granted except with respect to a single transaction that was not barred by the statute of limitations. In that transaction, which occurred in 1998, Hope traded a work by Jean-

Michel Basquiat that she already owned for a painting by Marc Chagall entitled "Le Couple Allonge." Hope then served an amended verified complaint, totaling some 147 pages, including 73 pages of exhibits and affidavits, on Epsteen, and Epsteen moved for summary judgment.[2] The magistrate judge issued a second report and recommendation finding that Epsteen's motion should be granted as to all of Hope's claims. The district judge adopted this report and recommendation, and it denied Hope's request to certify the judgment for immediate appeal under Fed. R. Civ. P. 54(b).

As a result of the two summary judgment orders, the only claims remaining in the case related to the single transaction between Hope and Klabal in 1998 which had survived the first summary judgment order. Klabal agreed to enter into a stipulation dismissing these remaining claims, and the parties filed the stipulation with the court under Fed. R. Civ. P. 41. Pursuant to this stipulation, the district court entered an order dismissing the remaining claims without prejudice. Hope now appeals from the two summary judgment orders.

II.

In light of the peculiar procedural posture of this case, we must first determine whether we have jurisdiction over the appeal. Thomas v. Basham, 931 F.2d 521, 523 (8th Cir. 1991). The jurisdiction of the federal appellate courts is limited to appeals from final decisions of the district courts, 28 U.S.C. § 1291, subject to the well-established exceptions set forth in 28 U.S.C. § 1292, Fed. R. Civ. P. 54(b), and the collateral order doctrine. Reinholdson v. Minnesota, 346 F.3d 847, 849 (8th Cir. 2003). Because none of these exceptions apply to the facts of this case, we must

---

[2]This procedure of submitting such a lengthy, detailed verified complaint is not one that we recommend, but it certainly enlarges the factual basis underlying the district court's entry of summary judgment against Hope.

address whether the district court's summary judgment orders as to Klabal and Epsteen, coupled with the dismissal of the remaining claims in the case, which happened to involve only Klabal, together constitute a "final decision" for purposes of § 1291. In other words, the question is whether the voluntary dismissal of the only claims that survived the earlier partial summary judgment orders was sufficient to make those orders final for purposes of this appeal.

A final decision requires "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned, is the end of the case." Goodwin v. United States, 67 F.3d 149, 151 (8th Cir. 1995). We are guided by the rule that the requirement of finality under § 1291 is given a "practical rather than a technical construction." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). In addition, the Supreme Court long ago established that a dismissal without prejudice can create an appealable final order if it ends the suit so far as the district court is concerned. See United States v. Wallace & Tiernan Co., 336 U.S. 793, 794 n.1 (1949).

Admittedly, this circuit has been less than clear in establishing the rules for finality when parties dismiss some of their claims without prejudice in order to appeal a partial summary judgment order or an interlocutory order of dismissal. See generally Terry W. Schackmann & Barry L. Pickens, The Finality Trap: Accidentally Losing Your Right to Appeal (Part II), 58 J. Mo. B. 138, 142-45 (2002) (collecting cases). However, in Chrysler Motors Corp. v. Thomas Auto Corp., 939 F.2d 538, 540 (8th Cir. 1991), we assumed jurisdiction over an appeal in a similar situation. In that case, the district court granted a motion for partial summary judgment but did not issue a Rule 54(b) certification. The parties later filed a stipulation of dismissal of all remaining claims without prejudice under Fed. R. Civ. P. 41, and the court entered an order of dismissal, as it did here. We held that the effect of the dismissal was to make the earlier partial summary judgment "a final judgment for purposes of appeal, even

though the district court had not so certified under Fed. R. Civ. P. 54(b)." 939 F.2d at 540.

We have since expressed concern that parties will use the voluntary dismissals of their claims without prejudice as an "end-run" around Rule 54(b), and in one instance we assumed jurisdiction over the appeal but deemed the dismissal of remaining claims to be with prejudice. Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1245 (8th Cir. 1994) (commenting that the parties "badly miscalculated" if they assumed they could later revive the dismissed claims); see also Orion Fin. Corp. v. Am. Foods Group, Inc., 201 F.3d 1047, 1048-49 (8th Cir. 2000) (dismissing appeal for lack of finality where parties entered a stipulation following partial summary judgment order because the parties intended to revive those issues later and were "play[ing] fast and loose with the limited appellate resources that we have.").

Nonetheless, many of our cases continue to follow the rule established in Chrysler and state that jurisdiction exists under the circumstances that we face here, without opining on whether the dismissed claims should be deemed dismissed with prejudice. See, e.g., Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 198 F.3d 685, 690 (8th Cir. 1999) ("Though we strongly disapprove of this use of a dismissal without prejudice to create what is in substance an impermissible interlocutory appeal, our prior case law did not foreclose that effort here."); Morris v. Crawford County, Ark., 299 F.3d 919, 921 (8th Cir. 2002) (partial summary judgment followed by voluntary dismissal of remaining claims without prejudice "had the dual effect of resolving all claims against the defendants and bestowing us with appellate jurisdiction"); Porter v. Williams, 436 F.3d 917, 920 (8th Cir. 2006) ("[A] partial summary judgment becomes a final judgment once the remaining parts of the case are dismissed or otherwise resolved."); Acton v. City of Columbia, Mo., 436 F.3d 969, 974 (8th Cir. 2006) ("[I]f the firefighters had voluntarily dismissed their meal

allowance and willfulness claims, this dismissal would have rendered the district court's [partial summary judgment] order unquestionably final.").

The procedural posture of this appeal is most closely analogized to that in Chrysler, and so we conclude that the voluntary dismissal of the remaining claims made the two earlier summary judgment orders final for purposes of this appeal. After the voluntary dismissal, there was nothing left for the district court to resolve, and the suit had ended as far as that court was concerned, thereby creating a final judgment. We now turn to the merits of Hope's arguments.

## III.

We review a grant of summary judgment de novo. Klehr v. A.O. Smith Corp., 87 F.3d 231, 234 (8th Cir. 1996). Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Minnesota law applies in this diversity case, and we review the district court's interpretation of that law de novo. Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005). We are bound by decisions of the Minnesota Supreme Court, and if that court has not considered an issue, we must follow decisions of the Minnesota Court of Appeals if they are the best evidence of Minnesota law. Id.

## A.

Hope first argues that the district court misapplied the discovery rule and the law of fraudulent concealment as they relate to whether the statute of limitations had expired for her fraud, breach of fiduciary duty, and RICO claims. Under Minnesota law, common law fraud and breach of fiduciary duty claims are governed by a six-year statute of limitations, while RICO claims have a four-year statute of limitations.

Minn. Stat. Ann. § 541.05, subd. 1(6); Anderson v. Anderson, 197 N.W.2d 720, 726 (Minn. 1972); Rotella v. Wood, 528 U.S. 549, 552 (2000). Accordingly, absent a delay in the beginning of the limitations period, Hope's claims are time-barred. Epsteen's most recent sale to Hope was on December 5, 1994; thus, all of Hope's claims against Epsteen became time-barred on December 5, 2000. Other than the 1998 transaction involving "Le Couple Allonge", which is no longer at issue in the case because of the parties' stipulation, the last sale by Klabal occurred on January 22, 1996, so Hope's claims against him became time-barred, at the latest, on January 22, 2002. Hope did not bring her original complaint until June 19, 2002.

Nonetheless, fraud, breach of fiduciary, and RICO claims are all subject to the "discovery rule," which dictates that the limitations period begins to run "when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered." Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn. 1985); see also Anderson, 197 N.W.2d at 726 (breach of fiduciary duty); Rotella, 528 U.S. at 553-54 (RICO). If the parties were in a fiduciary relationship, delay in discovering the fraud may be excusable. Toombs, 361 N.W.2d at 809. Ordinarily, a plaintiff's due diligence and the existence of a fiduciary relationship will be questions of fact for a jury, but "[w]here the evidence leaves no room for a reasonable difference of opinion ... the court may properly resolve fact issues as a matter of law." Veldhuizen v. A.O. Smith Harvestore Prods., Inc., 839 F. Supp. 669, 674-75 (D. Minn. 1993) (citing Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813, 817 (8th Cir. 1993)). The district court, adopting the report and recommendations of the magistrate judge, concluded as a matter of law that Hope was not diligent in discovering her cause of action and that Klabal and Epsteen had not acted as Hope's fiduciaries.

Hope argues that she created a genuine issue of material fact as to whether Klabal and Epsteen were her fiduciaries and that therefore her delay in discovering her claims was excusable. She alleges that she had never purchased any art as an investment before buying art from Klabal and Epsteen and that she relied entirely on

their advice to inform her of the value, nature, significance and quality of each piece of artwork. She claims that both defendants solicited and accepted her trust in their art expertise. Hope also contends that because she developed personal friendships with both Klabal and Epsteen, she was entitled to place her trust and confidence in them.

State law determines whether a fiduciary relationship exists, Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1215 (8th Cir. 1990), and under Minnesota law a "fiduciary relationship exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.'" Toombs, 361 N.W. at 809 (quoting Stark v. Equitable Life Assurance Soc'y, 285 N.W. 466, 470 (Minn. 1939). However, a fiduciary relationship is not established under Minnesota law in the context of commercial transactions simply by a long acquaintance between the parties or by the plaintiff having faith and confidence in the defendant where the plaintiff should have known the defendant was representing an adverse interest. See, e.g., Wells-Dickey Trust Co. v. Lien, 204 N.W. 950, 952-53 (Minn. 1925) (seller of property did not have a fiduciary duty to a buyer, even where the parties were intimate and longtime friends and the seller served as the executor of the buyer's husband's estate); Stark, 285 N.W. at 470 (absent a policy provision explicitly assuming a duty to the plaintiff, an insurance agent would not have had a fiduciary duty to a plaintiff who was illiterate, had limited business experience, and had been close friends and business acquaintances with the agent for years).

We are persuaded that no fiduciary relationship was present here. Hope did not produce any evidence indicating that Klabal or Epsteen explicitly assumed a duty to protect Hope's rights or that they had access to her finances or control over her decisions, thereby distinguishing their relationship from those where Minnesota courts have tolled the statute of limitations for fraud based on a fiduciary relationship. See,

e.g., Toombs, 361 N.W.2d at 809 (between a trustee and a beneficiary); Cohen v. Appert, 463 N.W.2d 787, 790 (Minn. Ct. App. 1990) (between an attorney and a client); Appletree Square I Ltd. P'ship v. Investmark, Inc., 494 N.W.2d 889, 892 (Minn. 1993) (between partners in a partnership); Murphy v. Country House Inc., 240 N.W.2d 507, 512 (Minn. 1976) (between directors of a corporation). The Minnesota Supreme Court has stated on numerous occasions that a friendship between the parties does not elevate an arms-length, commercial transaction to a fiduciary relationship. See, e.g., Kennedy v. Flo-Tronics, Inc., 143 N.W.2d 827, 830 (Minn. 1966); Shema v. Thorpe Bros., 62 N.W.2d 86, 91 (Minn. 1954); Stark, 285 N.W. at 470; Wells-Dickey Trust, 204 N.W. at 952. While Hope was not particularly knowledgeable about the art market, she admits to being a sophisticated business person and she should have known that Klabal and Epsteen represented an adverse interest. See Amended Complaint ¶ 77. Therefore, under Minnesota law, Hope has not raised a genuine issue of material fact as to whether Klabal and Epsteen were her fiduciaries, and the statute of limitations for her claims cannot be tolled on this ground.

Hope's alternative argument is that she created a genuine issue of material fact as to whether she could have discovered the fraud through the exercise of reasonable diligence within six years of bringing her claims. Bustad v. Bustad, 116 N.W.2d 552, 555 (Minn. 1962). "The mere fact that the aggrieved party did not actually discover the fraud will not extend the statutory limitation, if it appears that the failure sooner to discover it was the result of negligence, and inconsistent with reasonable diligence." Id. (citing First Nat. Bank of Shakopee v. Strait, 73 N.W. 645, 646 (Minn. 1898)). Even if Hope presents evidence that the defendants affirmatively concealed the initial fraud, she bears the burden of proving that she could not, through reasonable diligence, have discovered the facts constituting the fraud until within six years of the commencement of the action. See Blegen v. Monarch Life Ins. Co., 365 N.W.2d 356, 357 (Minn. Ct. App. 1985); see also Klehr v. A.O. Smith Corp., 521 U.S. 179, 194 (1997) (in RICO context, a plaintiff who is not reasonably diligent may not raise fraudulent concealment to toll the statute of limitations).

Hope argues that she exercised reasonable diligence in discovering the fraud. She contends that she had no reason to investigate whether she had a claim prior to 2000 because Klabal and Epsteen's fraud was "by its nature and design self-concealing," in that the pair misrepresented the nature and qualities of the art they sold, continually assured her that she was purchasing the artwork at prices below fair market value, praised each other's professed expertise and trustworthiness, and issued fraudulent insurance evaluations for her purchases. In addition, she alleges that Klabal discouraged her from selling her art through others and, in order to conceal the fraud, told her that Sotheby's was wrong when it appraised the art at lower prices. Hope states that these actions "removed any incentive [she] may have had to suspect misconduct or to investigate the possibility that she had any claim against either Defendant."

We conclude that Hope has failed to create a genuine issue of material fact as to her diligence in discovering the alleged fraud. Hope, a sophisticated business person, spent a total of $10 million on artwork, much of which was purchased "sight unseen" or never delivered, without independently confirming the value of the works she was purchasing either before or after the transactions. She was on notice that the insurance valuations provided to her by Klabal and Epsteen were not statements of the pieces' fair market value and that full appraisals could be obtained through the Art Dealers Association of America. Hope admits in her complaint as to Klabal that contemporary art pricing was available, and concedes as to both defendants that she was able to hire an independent expert to appraise the value of her purchases. In addition, Dr. Ewald's affidavit states that auction houses, if provided with a work of art or a clear photograph, will "identify three comparable works from the house's or a comparable house's sales records which were sold in that year, if available." Once Hope decided to hire an independent art appraiser, Dr. Ewald was able to ascertain the appropriate values of the works, so had Hope engaged the services of an art appraiser earlier she could have discovered that she had been overcharged. Cf. Barry v. Barry 78 F.3d 375, 380 (8th Cir. 1996) (plaintiff created genuine issue of fact as to her

-11-

diligence under Minnesota law where she hired attorneys and a financial advisor to advise her about a company's financial position, but the advisors were unable to discover the company's true financial condition because of affirmative fraudulent concealment). Furthermore, the price of the artwork Hope purchased was not so low that getting a second opinion would have been financially prohibitive. Cf. Balog v. Center Art Gallery- Hawaii, Inc., 745 F. Supp. 1556 (D. Haw. 1990) (discovery rule applied where the sellers' actions and the low price of the artwork effectively precluded the buyers from hiring an independent evaluator). While Hope contends that she could not have discovered that she paid inflated prices for the works because Klabal and Epsteen fraudulently concealed their actions, nothing Klabal or Epsteen did prevented her from having the art appraised and they were not in exclusive possession of pricing information for the pieces. See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 878 (8th Cir. 2000) (where a plaintiff has access to the facts that would make out the cause of action, the plaintiff has not been reasonably diligent). The Minnesota courts deem facts to have been discovered when "with reasonable diligence, they could and ought to have been discovered." Blegen, 116 N.W.2d at 357. Through the exercise of reasonable diligence, Hope could have discovered that she was paying inflated prices for the artwork more than six years before she brought her claims, and the district court did not err in finding as a matter of law that her claims were barred by the statute of limitations.

B.

Hope also contends that the district court erred in finding that the continuing tort doctrine did not toll the statute of limitations. She argues that Klabal and Epsteen's conduct constituted an ongoing fraud because they urged her to make many investments in order to achieve a significant and balanced portfolio of art. Under the continuing tort doctrine, the final act is used to determine when the statute of limitations period begins for the entire course of conduct. See Mille Lacs Band of Chippewa Indians v. Minnesota, 853 F. Supp. 1118, 1126 (D. Minn. 1994). However,

-12-

a plaintiff who is merely "feeling the present effects" of a past wrongful act may not avoid the statute of limitations. Id. Minnesota courts have held that where each transaction is separate, distinct, and could have been challenged by a plaintiff, the continuing tort doctrine does not apply. See Davies v. West Pub. Co., 622 N.W.2d 836, 842 (Minn. 2001) (sixteen stock distributions made over a period of years were discrete acts not tolling the statute of limitations). Each of the sales to Hope was individually priced and insured, and the transactions occurred over a period of many years. Consequently, the district court did not err in failing to toll the limitations period under the continuing tort doctrine.

## C.

Finally, Hope argues that the district court erred in applying the law of the case doctrine when granting summary judgment to Epsteen. When the magistrate judge issued his report and recommendation on Epsteen's motion for summary judgment, he declined to reconsider his prior conclusions that (1) Klabal was not Hope's fiduciary; (2) Klabal did not engage in fraudulent concealment because Hope was not diligent in seeking to discover her cause of action; (3) Epsteen and Klabal's actions did not amount to a continuing tort because each purchase of art was a distinct transaction; and (4) Klabal and Epsteen did not engage in conspiracy to defraud Hope. Hope's argument that the magistrate judge used these earlier rulings to preclude her claims against Epsteen is without merit. In deciding that Epsteen was entitled to summary judgment, the magistrate judge thoroughly reviewed Hope's amended complaint and conducted an independent analysis of whether Hope used due diligence in discovering her claims against Epsteen, whether Epsteen engaged in fraudulent concealment, and whether Epsteen acted as Hope's fiduciary. The magistrate judge declined to reconsider the argument that Klabal and Epsteen's conduct amounted to a continuing tort in light of the fact that Hope's amended complaint did not present any new evidence that would change its earlier conclusion that each art sale was a separate and discrete transaction. We conclude that there was no error on this ground.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____