# United States Court of Appeals

### For the Eighth Circuit

_____

## No. 14-3519

_____

TCF National Bank

*Plaintiff - Appellant*

v.

Market Intelligence, Inc.; Fidelity National Information Services, Inc.; LSI Appraisal, LLC; Lender Processing Services, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 20, 2015
Filed: February 4, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This case concerns the statutes of limitations for fraud, contract, and negligence claims brought by TCF National Bank ("TCF") against Market Intelligence.

("Market"). The district court[1] granted Market's motion for summary judgment on all claims on the grounds that the period of limitations for each claim had expired. TCF argues that summary judgment was improper because the district court decided two determinative factual issues regarding the fraud claims' discovery by drawing inferences against TCF, the nonmoving party. Further, TCF argues the district court erred in failing to toll the periods of limitations based on fraudulent concealment. We hold that the district court properly held that TCF discovered sufficient facts so that the limitations period for TCF's fraud claims expired before TCF filed suit in September 2011. We further hold that the non-fraud claims accrued more than six years before TCF filed suit and that the limitations period was not tolled to prevent expiration prior to September 2011.[2] Thus, we affirm.

I.

A.

We view the facts in the light most favorable to TCF. See United States Commodity Futures Trading Comm'n v. Kratville, 796 F.3d 873, 891 (8th Cir. 2015). TCF entered into a contract with Market under which TCF purchased Field Asset Verifications ("FAVs")[3] for Minnesota properties from Market in 2002.[4] FAVs, a less

---

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

[2]Because we affirm the district court's dismissal, this court need not address TCF's motion regarding Market's affirmative defenses.

[3]An FAV is defined in the contract as "a residential real property evaluation derived from a process that combines an external data source value (previous appraisal, automated estimate, prior sales price, etc.) with a 'drive-by' exterior inspection of the subject property by an agent licensed in residential real estate in the state in which the property is located. The agent, who may be an appraiser but is

expensive alternative to home appraisals, were used by TCF for the purpose of making residential loans. Then-director of consumer lending for TCF in Minnesota, Timothy Meyer, negotiated the agreement after ordering 13 test FAVs prepared by Market within the state and recommending FAVs to superiors.[5] Marketing materials stated that quality control for FAVS included "a 100% review process by qualified real estate analysts and appraisers." (Pl.'s Mot. for Summ. J., Ex. A, at 4.) These marketing materials included the representation that "[a]ll evaluations and appraisals are reviewed for quality as part of the MI process. Field work is reviewed and signed off by a qualified real estate appraiser." (Pl.'s Mot. for Summ. J., Ex. A, at 17.) The marketing materials were later changed to state that "[f]ield work is reviewed and signed off by . . . qualified reviewers supervised by an experienced appraiser." Although Meyer could not recall which specific materials he viewed or relied on in his decision-making process, TCF states that its decision to purchase FAVs was dependent on these and similar statements guarantying 100% review by qualified real estate appraisers.

---

usually a real estate agent, also provides at least one comparable sale, and other local market data. This product is intended primarily for use in consumer/home equity lending and the second mortgage market. The Field Asset Verification is not an appraisal and does not include either (a) a physical inspection of the interior of the subject property, or (b) photographs of the interior or exterior of the property, although photographs will be provided on request as will additional market data such as active listings." (Agreement to Purchase Services 3-4).

[4]This court has diversity jurisdiction. Appellee asserts in a Federal Rules of Appellate Procedure 28(j) letter that Defendant LSI Appraisal, LLC's sole constituent member at the time of removal was LPS Property Tax Solutions, Inc., a Delaware corporation with the principal place of business located in Florida.

[5]Previously, TCF had ordered FAVs from Market in Illinois and Colorado.

On August 29, 2002, Meyer sent a letter to Ted Mara, a customer service representative at Market, questioning a recent evaluation. Meyer wrote:

"Attached is a Field Asset Verification done by Market Intelligence in August 2002. This account was caught by one of my Regional Managers and raises some questions that I hope you can shed some light on. . . . A customer purchased the property one year ago for $149,000 and the county assessed tax value is $120,000. The customer estimated the property value at $235,000 and TCF subsequently ordered a FAV. The FAV came back at a value of $210,000. We acknowledge that Minnesota has had higher than normal appreciation as compared to other markets in the country, but given the significant value increase, my Regional Manager, at our own expense, ordered a full appraisal on the property which subsequently was completed and valued the property at $165,000. I would appreciate it if you could help us reconcile the significant difference between the FAV value and the appraisal. It seems unlikely that there would be this much disparity in the values, since in the FAV process, a real estate broker or appraiser is actually the one doing the driveby. I would appreciate a response in writing such that we can continue to have [a] comfort level with the quality of work that Market Intelligence does in our market."

(Defs.' Mot. for Summ. J., Ex. 8.) Following the letter, Meyer received a call from Mara "describing this as an aberration, reassuring [Meyer] on the quality review process that they have reinforcing the soundness of their work." Neither party could provide further details of the call's contents. TCF claims that the language used in the call specifically referenced Market's materials that state that all field work will be signed off by qualified real estate appraisers. Meyer was satisfied with Market's response and continued to use Market's FAVs.

By 2004, TCF had begun to notice "significant discrepancies between FAV and appraisal values for many properties, with FAV values being consistently higher." When TCF conducted full appraisals for borrowers seeking to refinance their loans,

-4-

it discovered that the full appraisals provided property values lower than the FAVs used in earlier loans, despite the fact that property values were generally increasing. Meyer "became concerned about whether or not using . . . FAV[s] was an appropriate way to value properties." He began tracking instances in which there were disparities in values, and in 2004, he shared the information with TCF's credit quality area. Doug Powers, an employee of TCF's credit quality area, then delivered a memorandum to Meyer on July 8, 2004, stating that "FAVs are the one[]s that had a majority of values in excess of 100%" of independently appraised value, and that the "reasons for the disparity are unclear, but may include . . . [d]ifferent models used by Market Intelligence for the two studies [an alternative evaluation method and FAV]." (Defs.' Mot. for Summ. J., Ex. 10.) The memorandum concluded that "[t]here is no obvious evidence of this but the large difference in results beg[s] the question." (Defs.' Mot. for Summ. J., Ex. 10.)

Meyer "just no longer trusted the FAV values." (Meyer Dep. 63). However, TCF did not follow up with Market, because Meyer had "already had a conversation about [his] concerns . . . in a prior year, and at that point . . . [his] conclusions were based on fact, where there w[ere] so many disparities in values that [he] lost confidence and [he] really wasn't interested in hearing another confidence speech or slick sales pitch about why that was still a good thing to use." (Meyer Dep. 64). Meyer states that the July 8, 2004 memorandum ultimately led to TCF terminating the contract. By February 11, 2005, TCF stopped ordering FAVs and terminated TCF and Market's agreement, effective June 11, 2005.

TCF claims that it later discovered that many of Market's FAVs were grossly overestimated and that Market would sometimes ignore comparable sales in the same area or building, ignore properties' tax-assessed values, fail to consider property conditions viewable from the street, and rely on property owners' own assessments in its FAVs. TCF also claims that had Market not inflated property values, TCF

would not have made certain mortgage loans. In 2008, an attorney for TCF sent a letter to Market threatening legal action for breach of contract based on the differences in FAV values and appraisals. The letter stated, "I believe that the facts [in the spreadsheets] clearly establish that the appraisals obtained through Market Intelligence under the contract attached as Tab 1 were the result of gross negligence." (Defs.' Mot. for Summ. J., Ex. 13.) In 2010, a TCF employee prepared an analysis of 6 FAVs supplied by Market and concluded that they all exhibited evidence of gross negligence.

B.

On September 21, 2011, TCF filed the underlying complaint against Market and its potential successors in liability. After several claims were dismissed, TCF amended its complaint. Market moved to dismiss, but the court denied the motion as to all claims. At the time of the summary judgment order at issue, TCF's claims against Market were (1) fraudulent inducement; (2) negligent appraisal; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) fraud; and (6) consumer fraud. Market sought summary judgment on all claims, arguing all were barred by the six-year statute of limitations under Minnesota law. TCF also filed a motion to dismiss all of Market's affirmative defenses and for partial summary judgment.

The district court granted Market's motion for summary judgment on all claims and denied TCF's motion. The district court found that each claim was barred by the six-year statute of limitations. Regarding fraud, the court found that even if the basis for the claim was unknown to TCF, "no reasonable jury could conclude that failing to investigate the problems with FAVs after becoming aware of additional, numerous, discrepancies in 2004 and 2005 was reasonably diligent, or that Meyer's inquiry to Mara demonstrated reasonable diligence in light of TCF's 2004 and 2005 concerns,"

and that had TCF investigated the FAVs, "the evidence suggests that . . . it likely would have revealed the fact that appraisers were not involved in the quality review process." As to the contract claim, the district court found that any breach would have occurred while the contract was in place, and thus before July 2005. Regarding the negligence claims, the court found that "some" damage occurred when TCF received each negligently performed value estimation, thus, similar to the contract claims, the limitations period began running while the contract was in place. The court concluded that none of the contract or negligence claims could be tolled by fraudulent concealment through September 2005, because TCF discovered the facts giving rise to the action in 2004, or alternatively, that any reasonable jury would find TCF's failure to investigate the discrepancies in value was unreasonable. Further, the court found that Meyer could not have reasonably relied on the 2002 assurances from Mara, because he had lost faith in the FAVs and Market by 2004.

On appeal, TCF argues that the court erred in determining (1) that the 2002 letter and corresponding phone conversation could not constitute reasonable diligence, because such a determination required making inferences in favor of Market and against TCF; (2) that no reasonable jury could find that if TCF had exercised due diligence, it would have been unable to discover the facts underlying the fraud; and (3) that the statute of limitations for each claim began running before the contract ended in 2005 and was not tolled by fraudulent concealment past that point. TCF argues additionally that the district court erred in failing to grant its motion for summary judgment on Market's affirmative defenses.

II.

"We review a district court's grant of summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party." Kratville, 796 F.3d at 891. "This court affirms where there are no genuine

-7-

issues of material fact, and judgment is appropriate as a matter of law." 281 Care Comm. v. Arneson, 766 F.3d 774, 779 (8th Cir. 2014). A fact is "material" if it may affect the outcome of the lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." Id. An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[W]e give the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." Johnson v. Securitas Sec. Services USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014). However, the party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 256; UnitedHealth Group Inc. v. Columbia Cas. Co., 47 F.Supp.3d 863, 872 (D. Minn. 2014) ("[S]ummary judgment is . . . [the] moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.").

## A. Fraud

This diversity action is governed by Minnesota substantive law. See United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003). The statute of limitations for TCF's fraud claims is six years. Minn. Stat. § 541.05, subd. 1 (various claims); subd. 1(2) ('liability created by statute); subd. 1(6) (fraud-related claims). However, Minnesota follows the "discovery rule" for fraud claims, under which "the limitations period begins to run 'when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered.'" Hope v. Klabal, 457 F.3d 784, 790 (8th Cir. 2006) (citing Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn. 1985)). "The mere fact that the aggrieved party did not actually discover the fraud will not extend the statutory limitation if it appears that the failure sooner to discover it was the result of negligence, and inconsistent with reasonable diligence." Id. at 792

(citing <u>Bustad v. Bustad</u>, 116 N.W.2d 552, 555 (Minn. 1962)). The plaintiff bears "the burden of proving that [it] could not, through reasonable diligence, have discovered the facts constituting the fraud until within six years of the commencement of the action." <u>Id.</u> (citing <u>Blegen v. Monarch Life Ins. Co.</u>, 365 N.W.2d 356, 357 (Minn. Ct. App. 1985)). Thus, the limitations period can be tolled by either showing that the party did exercise reasonable diligence and did not discover the facts constituting the fraud, or that the party could not have discovered the facts constituting the fraud, even if it had used reasonable diligence. The depth of investigation and inquiry required to establish reasonable diligence and toll the limitations period is dependent on the known facts and circumstances and what they reasonably suggest or permit. <u>Klehr v. A.O. Smith Corp.</u>, 87 F.3d 231, 237 (8th Cir. 1996); <u>see also</u> <u>Jane Doe 43C v. Diocese of New Ulm</u>, 787 N.W.2d 680, 685 (Minn. Ct. App. 2010).

TCF argues, first, that its fraud claim is not barred by the statute of limitations because it exercised reasonable diligence when Meyer wrote the letter to Market and spoke with Mara in 2002, and alternatively, assuming it did not exercise due diligence, that had it exercised due diligence, it could not have discovered the fraud. TCF posits that the court could not have found that TCF did not exercise reasonable diligence without drawing inferences about the contents Meyer's 2002 conversation against TCF, and further, that the court impermissibly drew inferences against TCF when it determined that no reasonable jury could find that if TCF had exercised reasonable diligence, it could not have discovered the relevant facts.

We hold, drawing inferences regarding the 2002 phone call in the light most favorable to TCF, that no reasonable jury could determine TCF exercised reasonable diligence. "Ordinarily, a plaintiff's due diligence . . . will be [a] question[] of fact for a jury, but '[w]here the evidence leaves no room for a reasonable difference of opinion . . . the court may properly resolve fact issues as a matter of law.'" <u>Hope</u>, 457 F.3d at 791 (citing <u>Veldhuizen v. A.O. Smith Harvestore Prods., Inc.</u>, 839 F. Supp. 669,

674-75 (D. Minn. 1993)). Even drawing inferences in favor of TCF, that Meyer and Mara discussed the role of appraisers, no reasonable jury could find that Meyer's 2002 conversation satisfied reasonable diligence after new information was discovered by Meyer in 2004. By 2004, Meyer had learned of numerous other discrepancies in FAV evaluations, and TCF's credit quality area concluded and reported that FAVs "had a majority of values in excess of 100%" of independently appraised values. These facts, which established that the FAVs were not producing reliable values as expected, were "sufficient to put a reasonable person on notice that a fraud claim may exist." See Veldhuizen, 839 F. Supp. at 676 (finding that notice that the product was not working as it was supposed to created an affirmative duty to investigate) (citing Bustad, 116 N.W.2d at 555); Klehr, 87 F.3d at 238.[6] The circumstances reasonably suggested that some further investigation or inquiry was required. See id.

TCF alternatively argues that because it relied on reassurances given by Market in 2002 when Meyer questioned its practices, a jury could find it to have exercised diligence, even without thoroughly investigating. See Marvin Lumber, 223 F.3d at 877-78. This argument fails because by 2004, TCF no longer had faith in Market's FAVs or the reassurances given in 2002. By 2004, Meyer "just no longer trusted the

---

[6]TCF cites Thompson v. Lutheran Bhd., to show that alarm at the return on a product does not provide notice of a fraud claim. No. 01-2433, 2003 U.S. Dist. LEXIS 26513 (D. Minn. Oct. 23, 2003). In Thompson, an individual purchased a life insurance policy and was startled by the value decline. Id. at *3. Unlike in Thompson, where the value of the product, a life insurance policy, was dependent on investments and thus could decline without wrongdoing, the purchased real estate evaluations produced unchanging numbers, verifiable based on data from the period in which they were made. Also differentiating Thompson from the current case, TCF, conducted an internal review after it discovered a high estimated value, and in doing so found out that a majority of the evaluations provided higher value estimates. Notably, the court in Thompson did not decide whether the facts known to the plaintiff triggered a duty to investigate. Id. at *11.

FAV values" and had "ultimately lost faith in [FAVs] as a valuation method." Meyer affirmatively chose not to reach out to Market and inquire further, "[b]ecause [Meyer had] already had a conversation about [his] concerns, . . . [his] conclusions were based on fact, . . . and [he] wasn't really interested in hearing another confidence speech or slick sales pitch about why that was still a good thing to use." Because by 2004 Meyer no longer believed the contents of the 2002 statements by Mara or that Market would provide anything other than a slick sales pitch when asked about discrepancies, no reasonable jury could believe that TCF continued to rely on the contents of the 2002 phone call or that the call mitigated TCF's duty to investigate.

Finally, TCF argues that the limitations period is tolled regardless of whether an investigation took place, because a reasonably diligent investigation could not have discovered the facts constituting the fraud. TCF points out that other than Market employees' admissions at their depositions, there is no evidence that upon further investigation Market would have admitted its fraud or that a later response by Market would have differed from that given in 2002.

TCF bears the burden of establishing that the facts could not have been discovered through reasonable diligence. Hope, 457 F.3d at 792 (citing Blegen, 365 N.W.2d at 357. TCF points to the marketing materials which it claims guaranteed that appraisers would be used in every evaluation and which Market continued to distribute until 2005 as evidence that Market would not have permitted TCF to uncover that appraisers were not involved in the development of all FAVs. Further, TCF relies on the response that Market gave in 2002 to Meyer's inquiries to show that Market would not have provided a truthful response. Lastly, TCF suggests that the level of sophistication involved in the FAV process effectively denied TCF an understanding of how FAV's were arrived at and made TCF entirely reliant on Market to deliver that which it had promised.

-11-

However, at summary judgment the nonmoving party may not merely point to unsupported self-serving allegations that are unsubstantiated by documentation or testimony. See Anda v. Wickes Furniture Co., 517 F.3d 526, 531 (8th Cir. 2008). Instead the nonmoving party "must substantiate . . . allegations with sufficient probative evidence that would permit a finding in . . . favor" of the party. Id. Thus, where no investigation has occurred, establishing that evidence could not have been found with reasonable diligence can be a difficult burden. "The mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient. Liberty Lobby, 418 F.3d at 873. TCF conducted internal research into the accuracy of FAV evaluations in 2004, but decided not to communicate any inquiry to Market or begin any investigation into Market's practices. All TCF offers in support of its conjecture is a motive for Market to hide its practices and the call in 2002 where Meyer can only recall Mara "describing [the evaluation mentioned in the letter] as an aberration, reassuring [him] on the quality review process that they have reinforcing the soundness of [Market's] work." This alone does not permit a reasonable jury to find that TCF established that if it had conducted reasonable diligence, it could not have discovered the facts constituting the fraud.

Because no reasonable jury could find that TCF exercised reasonable diligence through its 2002 letter and phone call or that TCF established that facts underlying the fraud claim could not have been discovered through due diligence, summary judgment on the fraud claims was appropriately granted.

## B. Contract

Under Minnesota law, the cause of action for a contract-based claim "accrue[s] at the time of the breach, even though actual damages occur later." Parkhill v. Minnesota Mut. Life Ins. Co., 174 F.Supp.2d 951, 956 (D. Minn. 2000). The statute of limitations for TCF's contract claims are six years. Minn. Stat. § 541.05, subd. 1.

-12-

TCF alleges that Market breached the contract by engaging in grossly negligent conduct, including ignoring relevant factors in making property value estimations. TCF also alleges that Market breached the implied covenant of good faith and fair dealing. We agree with the district court that any such breach would necessarily have only occurred while the contract was in place and while Market was bound by its provisions. The contract was terminated effective June 11, 2005. Thus, absent the presence of tolling, summary judgment was proper because the claim accrued and the limitations period began to run before the contract was terminated, which was prior to September 2005.

## C. Negligence

In Minnesota, the limitations period for negligent appraisal begins to run as soon as the cause of action would survive a motion to dismiss for failure to state a claim, and lasts six years. Herrmann v. McMenomy & Severson, 590 N.W.2d 641, 643 (Minn. 1999); Minn. Stat. § 541.05, subd. 1 (various claims); subd. 1(2) (liability created by statute); subd. 1(6) (fraud-related claims). Thus, the period of limitations will begin as soon as "some" damage has occurred as a result of the alleged action. Herrmann, 590 N.W.2d at 643. "The running of the statute does not depend on the ability to ascertain the exact amount of damages." Id. Minnesota case law supports a broad interpretation of "some" damage. Antone v. Mirviss, 720 N.W.2d 331, 336 (Minn. 2006).

TCF argues that "some" damage did not occur until TCF's borrowers defaulted and its mortgage lien was enforced. However, from the moment that TCF made a mortgage loan that it would not have made but for the inflated real estate value provided by Market, TCF held debts that were under secured. Further, at the moment TCF received the FAVs, they received negligent estimations of value, as opposed to the more accurate estimated values that TCF sought. Although the full amount of

damage may not have been ascertainable at the time the FAVs were delivered and the loan made, "some" damage had certainly occurred. If, for limitation purposes, "some" damage does not occur until foreclosure, a lender could be prevented from bringing suit for decades after realizing a value estimation it received was performed negligently. See Antone, 720 N.W.2d at 338 ("We conclude that such variations [as those caused by determining that the cause of action accrues when the party sustains money damages] insert too much ambiguity into the law and in the end come very close to establishing a discovery rule which we previously rejected because it presented the potential for unintended, open-ended liability."). Unless the negligent appraisal claim is tolled by fraudulent concealment, the period of limitations would have begun running while the contract was in place, or when TCF made a loan it would not have made absent a negligent FAV.

## D.  Tolling for Fraudulent Concealment

The period of limitations for a non-fraud claim may be tolled where the party can establish that the party against whom they are bringing the action fraudulently concealed the facts underlying the cause of action. Abbots v. Campbell, 551 F.3d 802, 805-06 (2008).[7]  "The doctrine of fraudulent concealment is very similar to the discovery rule that tolls the limitations period for a fraud cause of action." Cohen v. Appert, 463 N.W.2d 787, 791 (Minn. Ct. App. 1990) (citing Toombs, 361 N.W.2d at

---

[7]TCF argues that this court should find that the fraud claims are also fraudulently tolled.  However, in most claims of fraud, Minnesota applies the discovery rule, under which the limitations period begins to run when a plaintiff knew or should have known of the fraud, and thus already permits the claimant additional time where the facts underlying the cause of action have been concealed.  It is in circumstances in which the fraud claim is not subject to the discovery rule that Minnesota courts have permitted tolling for under fraudulent concealment.  See Thompson, 2003 U.S. Dist. LEXIS 26513 at *14-15.  TCF's fraud claims are subject to the discovery rule.

809).   The defending party must have taken affirmative acts intended to, and successful in, preventing discovery of the cause of action.  Id. at 790.  The limitation period will only be tolled "until the concealment is or could have been discovered through reasonable diligence."  Id. at 790-91.  "The party relying on the doctrine must show that its own negligence did not contribute to the delay in discovery."  Abbots, 551 F.3d at 806 (citing Cohen, 463 N.W.2d at 791).  As with the discovery rule, the court will examine whether it would have been possible for the injured party to uncover the relevant facts, had it sought them.  Generally, "fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment." Klehr v. A.I. Smith Corp., 875 F. Supp. 1342, 1349 (D. Minn. 1995) (quoting Hines, 880 F.2d at 999).  The plaintiff bears the burden of proving that they did not discover the facts giving rise to the cause of action.  Veldhuizen, 839 F.Supp. at 674.

TCF's contract and negligence claims were not tolled through September 2005, because no reasonable jury could find that TCF remained unaware of the bases for its claims.  TCF's negligence claims are not only based on Market's failure to use qualified appraisers in the FAV process, but also upon Market's "fail[ure] . . . to exercise reasonable diligence in developing an appraisal," "engag[ing] in negligence or incompetence in developing an appraisal," and "violat[ing] standards of professional practice."  TCF claims breach of contract based on the "gross negligence, malfeasance, or willful misconduct by MI or its agents," including "ignor[ing] comparable sales in the relevant market that were more similar than the comparable sale on which the agent based his or her value; ignor[ing] comparable sales in the same building, ignor[ing] the property's tax-assessed value, . . . fail[ing] to consider issues about the property's condition that were easily visible from the street, and blindly rel[ying] on the property owner's estimate without independently analyzing the property's value."  These claims are founded on the more general deficiencies of the FAVs, not specifically on whether qualified appraisers were involved in checking the FAVs.

Because the negligence and breach of contract claims have a more general focus on the deficiencies of the FAV values, and include deficiencies Meyer brought to Market's attention in 2002, TCF was aware of the underlying facts by September 2005. In 2002, Meyer contacted Market about a specific evaluation where the county assessed the tax value at $120,000, the property had been purchased for $149,000 the year prior, the customer estimated the value at $235,000, the FAV estimated the value at $210,000, and TCF's subsequent appraisal valued the property at $165,000. Regardless of whether Market offered reassurances to Meyer in the following phone conversation, prior to the cancellation of the contract in February 2005, Meyer had "lost faith in [FAVs] as a valuation method." Meyer stated that he sought no reassurances or explanation upon learning of the inflated values, because "[he]'d already had a conversation about [his] concerns . . . in a prior year, and at that point . . . [his] conclusions were based on fact, where there was so many disparities in values that [he] lost confidence and [he] really wasn't interested in hearing another confidence speech." Additionally, Meyer testified that prior to July 2004, he "had . . . begun to see properties where [TCF] had originated a loan using an FAV[, and] later th[e]n when [TCF] did appraisals, seeing significant disparities in values." (Meyer Dep. 61). TCF's internal memorandum from July 2004, stating that "FAVs are the one[]s that had a majority of values in excess of 100%" of independently appraised value, and that the "reasons for the disparity are unclear, but may include . . . [d]ifferent models used by Market Intelligence for the two studies [an alternative evaluation method and FAV]," further establishes that TCF was aware of the defects in the FAVs. Because TCF was aware of the alleged deficiencies with the FAVs before September 2005, even if Market affirmatively concealed defects in the 2002 phone call, the period of limitations expired before September 2011.

## III.

The limitations period for each claim began running, or ceased to be tolled, more than six years before TCF brought the instant action. We therefore affirm the district court's grant of Market's motion to dismiss as a matter of law. Because the dismissal is affirmed, we do not address Market's affirmative defenses.

_____